UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GERRIE DEKKER, et al.,

    Plaintiffs,

v.

VIVINT SOLAR, INC., et al.,

    Defendants.

No. C 19-07918 WHA

**ORDER RE VIVINT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO COMPEL**

**INTRODUCTION**

In this action for unfair business practices, defendants move for judgment on the pleadings, repeating many arguments addressed in previous orders. For many of the same reasons stated in those previous orders, this motion is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

A prior order details the facts (Dkt. No. 121). In short, defendant Vivint Solar, Inc., in its various corporate forms, installs solar panels on customers' roofs and, at least as advertised, sells those customers the low cost, clean energy produced over a twenty-year term pursuant to their "power purchase agreement" ("PPA") (Second Amd. Compl. ¶¶ 1–11). Plaintiffs' second amended complaint, however, alleges Vivint's contract contains unlawful liquidated-damages clauses, provisions which impose harsh and unlawful penalties onto dissatisfied customers.

The parties agree that the various PPAs signed by plaintiffs can be grouped into "Older PPAs" (signed by plaintiffs Dekker, Hilliard, Hulsey, and Bautista) and "Newer PPAs" (signed by plaintiffs Barajas/Bryson, Piini, and Rogers). This order takes judicial notice of the different versions of the PPA signed by plaintiffs (Dkt. No. 129).

This case has had a tortured procedural path, but for the purposes of this order, a few previous briefing rounds bear reciting. An order dated March 24, 2020, denied Vivint's Rule 12(b)(6) motion to dismiss Ms. Dekker's claims as time-barred (March 2020 Order, Dkt. No. 47). The order reasoned that neither the three- nor four-year statute of limitations provisions, nor the contractual one-year limitations period, barred her claims. Another order dated May 20, 2020, granted Mr. Bautista leave to amend and assert an unfairness Section 17200 claim and a liquidated-damages claim (May 2020 Order, Dkt. No. 63). That order reasoned that, although the facts remained incomplete, Vivint's agreement with Mr. Bautista could contain a liquidated-damages provision. Following its answer, Vivint now moves for judgment on the pleadings. This order follows full briefing and oral argument (held telephonically due to COVID-19).

**ANALYSIS**

After the pleadings are closed, a party may move for judgment per Rule 12(c). The analysis under Rule 12(c) is "functionally identical" to the analysis under Rule 12(b)(6). *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Specifically, all factual allegations in the complaint must be accepted as true and construed in the light most favorable to the non-moving party. *See Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citation and footnote omitted).

1. **LIQUIDATED-DAMAGES PROVISIONS.**

Vivint claims "discovery is not necessary" and argues review of the contracts will reveal, as a matter of law, that the PPAs' termination provisions are valid alternatives to performance, not unenforceable liquidated-damages provisions (Br. 1). This order disagrees.

Liquidated-damages contracts are generally void. CAL. CIVIL CODE § 1671(d). While an invalid liquidated-damages provision has "the invidious qualities characteristic of a penalty or forfeiture," a valid alternative-performance provision grants "the power to make a realistic and rational choice." A provision written in terms of alternative performance may nevertheless impose unenforceable liquidated damages when it "contemplate[es] but a single, definite performance" with additional charges contingent on breach of that performance. *Blank v. Borden*, 524 P.2d 127, 130–31 (Cal. 1974).

Vivint correctly notes that whether a provision is an unenforceable liquidated-damages clause is a question for the court (Br. 9). This validity issue, however, "is not really a classic question of law, but is one of fact that, because of its character, is nevertheless committed to judicial determination." *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1394 (Cal. Ct. App. 1991). Judgment with a partial factual record would thus be premature, especially if (like here) plaintiffs sufficiently allege that the contract disproportionately penalized breach.

The May 2020 order granted Mr. Bautista leave to amend and ruled he plausibly alleged that Vivint imposed an unlawful liquidated-damages provision. As stated, "it appears clear enough that Vivint's demands foreclosed any rational alternative to performance," in part because "Vivint demanded 95% of the remaining payments from Mr. Bautista" along with system removal costs (May 2020 Order 9–11). Allegations in the second amended complaint like this reveal a material factual dispute over whether the remedies Vivint pursued for breach constituted invalid penalties. As the May 2020 order states, further discovery will illuminate these issues.

Even if this order disregards these previous holdings and focuses on the four corners of the agreements anew, as Vivint requests, material factual disputes on validity remain. *First*, the plain language of the default provisions of the Older and Newer PPAs do not, per se, provide alternatives to performance. The parties acknowledge that the older 1.0, 2.6, and 2.8 versions of the PPA can be analyzed together. This order refers to the 2.8 version, the operative version for a plurality of plaintiffs who signed the Older PPAs. The Older PPAs ascribe the following remedies to Vivint when a customer defaults on payment (italics added):

3

> Remedies for Customer Default. If a Customer Default occurs, We may exercise any of the following remedies: (i) terminate this Agreement and demand You pay the Default Payment; (ii) leave the System in place on Your Property, but deny You access to and use of the Energy it produces, which may be redirected and sold at Our election; (iii) disconnect or take back the System as permitted by applicable law; (iv) place a lien on Your Property; (v) engage a collection agency to collect payments from You; (vii) [sic] report Your default to credit reporting agencies; *and/or (vii) exercise any other remedy available to Us in this Agreement or under applicable law*.

Later on in the paragraph, the Older PPAs describe the calculation of the default payment, and state: "After You pay to Us the Default Payment, We will transfer ownership of the System to You on an 'As Is, Where Is' basis" (Older PPAs ¶ 13(b), (e), Dkt. No. 129-3, Exh. C). These two sentences conflict. The default payment definition assigns ownership of the system to the customer once payment is made, but the remedies section just above it states that Vivint can demand both default payment and — as indicted by "and/or" — *pursue other listed remedies as well*, such as taking back the system. This scenario is exactly what the second amended complaint alleges occurred to Mr. Bautista (Second Amd. Compl. ¶ 26). Exercising multiple default remedies strongly suggests the existence of a penalty and/or a forfeiture. At best, this provision is ambiguous, and extrinsic evidence "can be offered where it is obvious that a contract term is ambiguous, but also to expose a latent ambiguity." *S. Pac. Trans. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1240–41 (Cal. Ct. App. 1999). Further factual findings are necessary to define the scope of the default provisions. It will be illuminating to dig into Vivint's files to see how it has, in fact, implemented these provisions.

For the Newer PPAs, the same problems persist. This order refers to the 3.2 PPA signed by Ms. Piini in citations to the Newer PPAs. The Newer PPAs clarify the default provision to Vivint's further benefit. Vivint's list of available remedies now reads (italics added):

> Remedies for Customer Default. If a Customer Default occurs, We may exercise any of the following remedies: (1) terminate this Agreement and demand You pay the Default Payment; (2) leave the System in place on Your Property, but deny You use of the Energy it produces, which may be redirected and sold at Our election; (3) disconnect or take back the System as permitted by applicable law; (4) engage a collection agency to collect payments from You; (5) report Your default to credit reporting agencies; (6) suspend Our performance under the Agreement; *and/or (7)*

4

> *exercise any other remedy available to Us in this Agreement or under applicable law. Seller's remedies set forth in this <u>Section 6(b)(ii)</u> are cumulative and not exclusive.*

Similar to the Older PPAs, the description of the default payment in the Newer PPAs state: "After You pay to Us the Default Payment, We will transfer ownership of the System to You on an 'As Is, Where Is' basis; *provided* that We will retain all right and title to the System Interests" (Newer PPAs ¶ 6(b)(ii), (v), Dkt. 22-7, Exh. G). The Newer PPAs continue to grant Vivint the right to seek multiple remedies, and even specify that the available remedies are "cumulative" — Vivint explicitly need not seek only default payment, for example. Plaintiffs have sufficiently pled, at minimum, that the language of the termination provisions in both the Older and Newer PPAs can be read to impose invalid liquidated-damages provisions.

*Second*, the transfer provisions of the Older and Newer PPAs cannot, on the pleadings, be interpreted as providing alternatives to performance. "[T]o constitute a liquidated damage clause the conduct triggering the payment must in some manner breach the contract." *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1315 (Cal. Ct. App. 2005). Here, when a Vivint customer sells her home, the Older PPAs require the customer to either assign the contract to the new homeowner, or to pay up. The Older PPAs' transfer-payment provisions read:

> [I]f We determine that Property Transferee is not adequately creditworthy to assume Your obligations under this Agreement, or Property Transferee refuses to assume Your obligations under this Agreement, We may terminate this Agreement on written notice to You and You will be obligated to pay to Us an amount equal to Four Dollars ($4) per watt installed, subject to a reduction of five percent (5%) per year (e.g. in year 20, the Transfer Payment will be $1.56 per watt installed), plus applicable taxes (the "**Transfer Payment**"). After You pay to Us the Transfer Payment, We will transfer ownership of the System to You on an "As Is, Where Is" basis.

(Older PPAs ¶ 12(b)). Viewing the facts in the light most favorable to the non-moving party, plaintiffs have sufficiently alleged that the sale of a property, without first preserving the contract through assignment to the new homeowner, constitutes early termination and breaches the twenty-year term of the PPA, triggering penalties (Second Amd. Compl. ¶¶ 17–26, 45–51). Critical questions such as how Vivint formulated the transfer payment, the relation between the

5

transfer payment and the cost of breach, the actual value of the solar panels, and how proportional the transfer payment is to a customer's total contractual balance remain unanswered at this point. This order thus cannot determine as a matter of law that the transfer-payment provision in the Older PPAs is a valid alternative to performance.

The Newer PPAs recite that the customer has four options when she seeks to move and transfer her property: (1) assignment to the new homeowner; (2) prepayment; (3) relocation of the system to the customer's new home; and (4) early purchase. Prepayment and early-purchase election require, at minimum, a lump-sum payment of the remainder of the contract's balance, with a five-percent discount. Vivint maintains ownership of the system if the owner chooses the prepayment option, and it still requires the new owner to comply with "all other obligations under" the PPA. Early purchase, a one-time option available six years into the agreement, transfers ownership of the system "As Is, Where Is" (Newer PPAs ¶¶ 3(c), 5(n)).

The Newer PPAs wily characterize the transfer provisions as "options," but this order need not accept a contract's characterization of a provision, especially a self-serving characterization. Viewing the Newer PPAs in the light most favorable to plaintiffs, the "true function" of the transfer provisions is not providing alternatives to performance. When a current Vivint customer moves and does not in some way preserve the twenty-year contract — either by assignment or relocating the system to their new property — the PPA penalizes the customer by imposing hefty fines. And, should a customer refuse this first round of "options," the PPA holds her in default. Just because default sits behind the transfer provisions does not render the transfer provisions any less of a penalty for breach. The Newer PPAs contemplate one method of performance — maintaining the service contract for the full term. Everything else, at this point, could be construed as a penalty. At base, the default and the transfer provisions function as punishments for not maintaining the contract. *See Blank*, 524 P.2d at 130–31. These provisions cannot be considered alternatives to performance at this stage.

Vivint's supplementary arguments regarding liquidated damages can also be dispatched. Vivint argues that the termination fees are not liquidated damages because they are not triggered by breach (Br. 12). As explained, the termination provisions serve to penalize failure

to complete the full twenty-year term of the PPA. Vivint also argues plaintiffs fail to allege breach of the PPA (Br. 15). But plaintiffs have not filed a breach of contract claim. The complaint rather challenges the underlying validity and enforceability of the PPAs' termination provisions. To properly state a claim under Section 1671, plaintiffs must allege sufficient facts that the imposition of a provision (1) arises from a breach of contract, and (2) the liquidated damages amount is a fixed and certain sum. *See Chodos v. West Publ'g Co.*, 292 F.3d 992, 1002 (9th Cir. 2002); *Garret v. Coast & S. Fed. Sav. & Loan. Ass'n*, 511 P.2d 1197, 1201–02 (Cal. 1973). As explained, plaintiffs have properly pleaded that the PPA contains such provisions. Plaintiffs also adequately allege injuries in fact resulting from those provisions (Second Amd. Compl. ¶¶ 17–25, 96–97).

In sum, Vivint's motion for judgment on the pleadings as to liquidated damages fails. Discovery is well under way, and Vivint has not justified cutting off the factual record. The nature of the allegations and the PPAs' nebulousness require the validity decision to wait for summary judgment or trial.

2. **STATUTORY AND CONTRACTUAL LIMITATIONS PERIODS.**

Vivint has not successfully distinguished its current timeliness arguments from those rejected in the March 2020 and May 2020 orders. The March 2020 order denied Vivint's Rule 12(b)(6) motion to dismiss Ms. Dekker's claims for being time-barred. And the May 2020 order denied Vivint's timeliness arguments as to Mr. Bautista and granted him leave to amend. These orders based their rulings on California's default last-element accrual rule, as well as classic equitable exceptions, including the discovery rule and continuous accrual (March 2020 Order 10–11; May 2020 Order 3–5). The rationales underlying those orders require the same result for the deceptive sales practices Vivint addresses in this Rule 12(c) motion.

Vivint attempts to dodge the previous orders by distinguishing between deceptive *sales* practices and unlawful contractual provisions. Vivint argues here that the claims for deceptive sales practices necessarily accrue at formation (Br. 17). Not so. For purposes of timeliness, harm from deceptive sales practices may not necessarily occur at formation and may instead occur when the contract is imposed or enforced. *See Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d

7

871, 875 (Cal. 2013). As the May 2020 order noted, recent ongoing violations, such as enforcement of void contracts against Mr. Bautista, remain within the relevant time periods. And as the March 2020 order stated, the discovery rule delays accrual until the plaintiff had (or should have had) inquiry notice.

Judgment on the pleadings that a claim is barred by the applicable statue of limitations is appropriate "only when the running of the statute is apparent on the face of the complaint." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quotation omitted). Viewing the facts in a light most favorable to plaintiffs, Vivint has not carried its burden. Plaintiffs' claims are not facially untimely.

### 3. PLAINTIFF BAUTISTA.

Lastly, Vivint contends that this order should either compel Mr. Bautista to arbitration or, in the alternative, grant Vivint judgment on the pleadings for Mr. Bautista's claims. This order disagrees.

As an initial matter, Vivint's motion for judgment on the pleadings that Mr. Bautista be compelled to arbitrate improperly asserts a motion for reconsideration. Civil Local Rule 7-9(a) requires a party requesting reconsideration of a past order to first seek leave of court, and Civil Local Rule 7-9(c) prohibits the repetition of arguments originally made in the challenged order. Here, Vivint explicitly contends that the court erred as a matter of law in the March 2020 order and states that it now "renews" its motion to compel arbitration (Br. 19). This order will not permit Vivint to circumvent Civil Local Rule 7-9 and entertain a motion for reconsideration in the guise of a Rule 12(c) motion.

Considering, nevertheless, the substance of Vivint's arguments, the motion still fails because all Vivint's support is inapposite. In *Circuit City Stores, Inc. v. Ahmed*, the plaintiff challenged the arbitration provision in his employment agreement on the grounds he did not have the degree of sophistication necessary to understand the provision. 283 F.3d 1198, 1200 (9th Cir. 2002). Mr. Bautista is, in contrast, alleged to have virtually no English proficiency (Second Amd. Compl. ¶ 26). Unlike *Randas v. YMCA of Metropolitan Los Angeles*, where the plaintiff was not literate in English and simply signed the English form without further ado,

Vivint's salesperson allegedly explained the English contract to Mr. Bautista in Spanish. 17 Cal. App. 4th 158, 160 (Cal. Ct. App. 1993). *Randas* also found that the YMCA had no reason to suspect plaintiff could not read the form; again, not so here. *Id.* at 163.

Lastly, *Ramos v. Westlake Services LLC* voided an arbitration agreement for fraud in the execution when the Spanish translation of Ramos' contract did not replicate the arbitration provision contained in the signed, English version. 242 Cal. App. 4th 674, 687–90 (Cal. Ct. App. 2015). Vivint changes its tune in its reply brief, arguing that *Ramos* is "not on point" because it did not address the plaintiff's English comprehension (Reply Br. 12–13). *Ramos*, however, stated the germane principle that a contract is void if there was no mutual assent — the same principle the March 2020 order cited in its denial of Vivint's motion to compel arbitration. As the March 2020 order made clear, an arbitration agreement arguably never *formed* between Mr. Bautista and Vivint in the first place because Mr. Bautista's conduct could not reasonably be taken as assent to the agreement (March 2020 Order 9–10). Vivint also makes the related argument that the California Translation Act does not nullify agreements like Mr. Bautista's alleged arbitration agreement, it only provides for recission (Br. 19). But this is immaterial. As explained, the decisions here and in the March 2020 order are not premised on the Translation Act but basic tenets of contract formation under California law.

Vivint proffers, in the alternative, that all Mr. Bautista's claims fail as a matter of law. As explained, plaintiffs' claims for liquidated damages and derivative Section 17200 and CLRA claims pass muster at this point. But Vivint also specifically challenges Mr. Bautista's Section 17200 unfairness claim based on Vivint's alleged failure to provide a translation of the PPA. A plaintiff may assert a Section 17200 claim under the unfairness prong even when the alleged conduct was not unlawful. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539–40 (Cal. 1999). But, where a plaintiff asserts an unfairness claim without alleging unfairness beyond violations of a statute not subject to a separate, live claim, the Section 17200 claim fails. *Bothwell v. Abbott Laboratories, Inc. (In re Vaccine Cases)*, 134 Cal. App. 4th 438, 457–58 (Cal. Ct. App. 2005).

As currently pleaded, the second amended complaint has not sufficiently alleged Vivint's failure to provide a translation violated the Section 17200 unfairness prong. The May 2020 order denied Mr. Bautista leave to include a separate Translation Act claim, but plaintiffs' second amended complaint focuses solely on violations of the Translation Act without separately alleging how or why Vivint's actions were unfair (Second Amd. Compl. ¶ 104). Vivint's motion as to the Section 17200 claim is **GRANTED** to the extent it alleges unfairness based on violations of the Translation Act as to Mr. Bautista.

## CONCLUSION

Vivint's motion for judgment on the pleadings as to the liquidated-damages claims and the derivative CLRA and Section 17200 claims is **DENIED**.

Vivint's motion for judgment on the pleadings regarding the Section 17200 claim to the extent it alleges unfairness as to Mr. Bautista based on Translation Act violations is **GRANTED**.

Plaintiff may seek leave to amend the complaint. Plaintiff has **FOURTEEN DAYS** from the date of this order to file a motion, noticed on the normal 35-day calendar, for leave to file an amended complaint. Their motion must affirmatively demonstrate how the proposed amended complaint corrects the deficiencies identified in this order, as well as any other deficiencies raised in defendant's motion, if at all, but not addressed herein. The motion should be accompanied by a proposed amended complaint as well as a redlined copy of the amended complaint. Plaintiffs must plead their best case.

**IT IS SO ORDERED.**

Dated: June 8, 2021

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10