**EXHIBIT 1**

Matthew J. Matern (SBN 159798)
Joshua D. Boxer (SBN 226712)
MATERN LAW GROUP, PC
1230 Rosecrans Avenue, Suite 200
Manhattan Beach, California 90266
Telephone: (310) 531-1900
Facsimile: (310) 531-1901
mmatern@maternlawgroup.com
jboxer@maternlawgroup.com

Corey B. Bennett (SBN 267816)
MATERN LAW GROUP, PC
1330 Broadway, Suite 428
Oakland, California 94612
Telephone: (510) 227-3998
Facsimile: (310) 531-1901
cbennett@maternlawgroup.com

*Attorneys for Plaintiffs, individually, and
on behalf of all others similarly situated*

Fred Norton (CA SBN 224725)
Bree Hann (CA SBN 215695)
George C. Harris (CA SBN 111074)
Esther Chang (CA SBN 258024)
THE NORTON LAW FIRM PC
299 Third Street, Suite 200
Oakland, CA 94607
Telephone: (510) 906-4900
fnorton@nortonlaw.com
bhann@nortonlaw.com
gharris@nortonlaw.com
echang@nortonlaw.com

Attorneys for Defendants

VIVINT SOLAR, INC., VIVINT SOLAR
HOLDINGS, INC., VIVINT SOLAR
DEVELOPER, LLC, AND
VIVINT SOLAR PROVIDER, LLC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GERRIE DEKKER, individually and on behalf of others similarly situated,<br><br>       Plaintiff,<br><br>     v.<br><br>VIVINT SOLAR, INC., VIVINT SOLAR HOLDINGS, INC., VIVINT SOLAR DEVELOPER, LLC, and VIVINT SOLAR PROVIDER, LLC, DOES 1 through 50, inclusive,<br>       Defendants. | CASE NO. 3:19-CV-07918-WHA<br><br>**JOINT STIPULATION OF CLASS ACTION SETTLEMENT AND RELEASE OF CLAIMS**<br><br>Honorable William H. Alsup |

## **EXHIBITS**

Notice of Class Action Settlement ................................................................................A

Standard Form of the PPAs at Issue ..............................................................................B

Form of Request for Exclusion ......................................................................................C

Settlement Administrator Scope of Work ......................................................................D

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This Joint Stipulation of Class Action Settlement Agreement and Release of Claims ("Agreement") is made and entered into between: (1) Plaintiff Gerrie Dekker ("Dekker"), individually and on behalf of the Class, and (2) Defendants Vivint Solar, Inc., Vivint Solar Holdings, Inc., Vivint Solar Developer, LLC, and Vivint Solar Provider, LLC (collectively, "Defendants" or "Vivint Solar") (Plaintiff and Defendants together, "the Parties"). This Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Action (as defined below) and the Released Claims (as defined below), upon and subject to the terms and conditions hereof, as follows:

## 1.     DEFINITIONS

As used herein, for the purposes of this Agreement only, the following terms shall be defined as set forth below:

1.1.     **"Action"** refers to the civil action entitled: *Gerrie Dekker v. Vivint Solar, Inc., et. al*, United States District Court for the Northern District of California as Case 3:19-CV-07918-WHA. The Action was filed as a class action.

1.2.     **"Agreement"** refers to this Joint Stipulation of Class Action Settlement Agreement and Release of Claims, which includes all of the Recitals and the Exhibits attached hereto.

1.3.     **"Class"** refers to all persons in California currently in privity of contract with Vivint Solar because they are subject to Version 1 of the Vivint Solar Residential Solar Power Purchase Agreement.

1.4.     **"Class Counsel"** refers to Matthew J. Matern, Joshua D. Boxer, and Corey B. Bennett of Matern Law Group, PC.

1.5.     **"Class Member(s)"** refers to any individual who is a member of the Class.

1.7.     **"Class Representative"** refers to the named Plaintiff in the Action, Gerrie Dekker.

1.8.     **"Class Representative Service Award"** refers to any payment, subject to Court approval, to the Class Representative in recognition of her efforts and work in prosecuting the Action on behalf of the Class Members.

1.9.     **"Complaint"** refers to the original Complaint filed on December 3, 2019 and any and all amended complaints in this Action.

1.95    **"Defendants"** refers to Vivint Solar, Inc., Vivint Solar Holdings, Inc., Vivint Solar Developer, LLC, and Vivint Solar Provider, LLC.

1.1.    **"Effective Date"** refers to the date the Court has entered and filed the Final Approval Order and Judgment and the time period for appeal of the Judgment has been exhausted without any appeals having been filed, and/or all such appeals have been voluntarily or involuntarily dismissed, and/or the appropriate appellate court or courts have entered an order affirming the Final Approval Order and Judgment of the Court and the order of such appellate court or courts is no longer subject to any further appellate challenge or procedure.  The Parties agree that only the Parties and/or Class Members who file a valid and timely Objection maintain the right to appeal.

1.2.    **"Final Approval Order"** refers to the final order by the Court approving the Settlement following the Final Fairness Hearing.

1.3.    **"Final Fairness Hearing"** refers to the hearing at which the Court will make a final determination whether the terms of the Agreement are fair, reasonable, and adequate for the Class and meet all applicable requirements for Final Approval.

1.4.    **"Judgment"** refers to the final judgment by the Court approving the Settlement.

1.5.    **"Notice of Class Action Settlement"** refers to the Notice of Class Action Settlement, substantially in the form attached as Exhibit A.

1.6.    **"Objection"** refers to a timely, written, signed objection by a Class Member who elects to object to the Settlement, substantially in the form detailed in the Notice of Class Action Settlement.

1.7.    **"Parties"** refer to (1) Plaintiff Gerrie Dekker, individually and on behalf of the certified class, and  (2) Defendants Vivint Solar, Inc., Vivint Solar Holdings, Inc., Vivint Solar Developer, LLC, and Vivint Solar Provider, LLC.

1.8.    **"Plaintiff"** refers to Gerrie Dekker.

1.9.    **"Preliminary Approval Order"** refers to the order issued and entered by the Court following a Motion for Preliminary Approval of the Settlement and this Agreement.

1.10.    **"Released Claims"** refers to those claims defined in Section 7 of this Agreement. The Released Claims shall apply to all Class Members.

1.11.  **"Released Parties"** refers to (i) Defendants Vivint Solar, Inc., Vivint Solar Holdings, Inc., Vivint Solar Developer, LLC, and Vivint Solar Provider, LLC, and (ii) their parent entities, including but not limited to Sunrun Inc.

1.12.  **"Settlement"** refers to terms of this Agreement, which includes the Recitals and the Exhibits attached hereto.

1.13.  **"Settlement Administrator"** refers to the third-party administrator, who has been mutually selected by the Parties, subject to Court approval, to perform the notice, claims administration, and distribution functions.

1.14.  **"Settlement Class"** refers to all Class Members.

## 2.  PROCEDURAL HISTORY AND RECITALS

2.1.  **Procedural History**.  On December 3, 2019, Plaintiff Gerrie Dekker and others who are not members of the Class filed their original Complaint against Defendants.  The other plaintiffs were dismissed from the Action pursuant to agreements to arbitrate, or in the case of one plaintiff, by settlement.  Following law and motion and discovery, on March 18, 2022 the Court certified a Class of persons in California currently in privity of contract with Vivint Solar because they are subject to Version 1 of the Vivint Solar Residential Solar Power Purchase Agreement.  On June 2, 2022, the Parties participated in a Mandatory Settlement Conference ("MSC") with Magistrate Judge Ryu.  The case did not settle at that time, but with the permission of Magistrate Judge Ryu, the Parties exchanged further settlement offers and demands in writing and then met for another session with Magistrate Judge Ryu on July 19, 2022.  At the July 19, 2022 MSC, the Parties reached agreement on a settlement in principle (Dkt. 274) and on July 20, 2022, the parties signed a term sheet.

2.2.  **The Parties Have Conducted Relevant Discovery**.  During the litigation of this Action, the Parties have engaged in written discovery.  Defendants served a Notice of Oral Deposition and completed the deposition of Plaintiff.  Defendants also served a Demand for Production of Documents, and received documents from Plaintiffs.  Plaintiff also propounded multiple sets of Demands for Production and Interrogatories against Defendants, and received responses from Defendants.  Plaintiff served a notice of deposition of Defendants under Rule 30(b)(6), and completed that deposition.  The Parties further retained experts and those experts were subsequently deposed.

77946185v.2

2.3.    **Defendants' Denials**.  Defendants denied and continue to deny: (a) all of the allegations made by the Class Representative or the Class in the Action; (b) that they violated any applicable laws; (c) that they are liable or owe damages, penalties, or other compensation or remedies to anyone with respect to the alleged facts or claims asserted in the Action; and (d) that class certification or representative treatment of the Action or any alleged claim is proper.

Nonetheless, without admitting or conceding any liability or wrongdoing whatsoever and without admitting or conceding that class certification or representative treatment is appropriate for any purpose other than settlement purposes alone, Defendants have agreed to settle the Action on the terms and conditions set forth in this Agreement, to avoid the burden, expense, and uncertainty of continuing the Action.  Any stipulations or statements by Defendants contained in this Agreement are made for settlement purposes only.

2.4.    **Class Counsel's Evaluation**.  Based on Class Counsel's evaluation, Class Counsel is of the opinion that the terms set forth in this Agreement are fair, reasonable, adequate, and in the best interest of the Class Members.  Class Counsel represents that they diligently and effectively investigated Plaintiffs' claims, drafted the Complaint and subsequent Amended Complaints, interviewed witnesses, prepared and responded to discovery, reviewed and analyzed documents produced, prepared for and defended the deposition of the Class Representative, analyzed Defendants' records in consultation with their retained experts, and filed a Motion for Class Certification.  Class Counsel concluded that the Settlement reflected in this Agreement is in the best interests of the Class, after reviewing deposition transcripts, completing interviews with potential Class Members, reviewing Defendants' policies, and evaluating the risk that further litigation might result in Plaintiff and the Class not recovering anything at all, which was a very significant factor in determining that this Agreement is fair, reasonable, and adequate.

2.5.    **The Parties' Intent**.  It is the desire of the Parties to fully, finally, and forever settle, compromise, and discharge any and all claims, rights, demands, charges, complaints, causes of action, obligations, or liability of any and every kind that were or could have been asserted in the Action, to the extent that such claims arise out of the alleged facts, circumstances, and occurrences

underlying the allegations as set forth in the claims in the operative Third Amended Complaint in the Action.

        2.6.    **The Parties' Agreement to Cooperate**.  The Parties agree to cooperate and to take all steps necessary and appropriate to effectuate all aspects of this Agreement, to obtain a Preliminary Approval Order and Final Approval Order of this Settlement, and to dismiss the Action and claims of Class Members with prejudice upon final approval.

     **NOW THEREFORE**, in consideration of the covenants and agreements set forth herein, and of the release and dismissal of all Released Claims, the Parties stipulate and agree to the terms and provisions of this Settlement and Agreement, subject to the approval of the Court.

     **3.**    **NOTICE TO CLASS MEMBERS**

        3.1.    **Settlement Administrator**.  The Parties will request that the Court appoint Phoenix Class Action Administration Solutions as Settlement Administrator.  The Parties agree that settlement administration costs shall not exceed $7,000 (seven thousand dollars), based on a written bid received from the Settlement Administrator.  The duties of the Settlement Administrator shall be limited to the scope of work described in the written bid (Exhibit D), and shall not be enlarged or modified without the agreement of both Plaintiff and Defendants.  All disputes relating to the Settlement Administrator's performance of its duties, after good-faith efforts by the Parties to first resolve such disputes, will be referred to the Court, if necessary, which will have continuing jurisdiction over this Action until all obligations contemplated by this Agreement have been fully completed.

        3.2.    **Class Data For Settlement Administrator**.  Within 20 calendar days of the entry of a Preliminary Approval Order of this Agreement, Defendants shall provide to the Settlement Administrator with the following information: (1) name of each Class Member; (2) most current known physical and email address of each Class Member.

        3.3.    **Confidentiality Of Class Member Contact Information And Data**.  The contact information is being provided confidentially, and the Settlement Administrator shall treat the information as private and confidential and take all necessary precautions to maintain the confidentiality of contact information of the Class Member.  This information is to be used only to carry out the Settlement Administrator's duties as specified in this Settlement Agreement.  The Settlement

Administrator shall return the class data to Defendants or confirm its destruction upon completion of the Settlement Administrator's duties in administering the Settlement.

3.4. **Mailing Of Notice Of Class Action Settlement and Request for Exclusion**. The Settlement Administrator shall mail and e-mail the Notice of Class Action Settlement and Request for Exclusion to Class Members within 14 calendar days of receiving the Class Member data from Defendants. The Settlement Administrator shall send the Notice of Class Action Settlement to Class Members and Request for Exclusion via First Class U.S. Mail, using the most current, known mailing address for each Class Member based on information provided by Defendants, as well as the e-mail addresses provided.

3.4.1 **Content Of The Notice Of Class Action Settlement.** The Notice of Class Action Settlement shall be substantially in the form attached as Exhibit A to this Agreement.

3.4.2 **Content Of The Request For Exclusion.** The Request for Exclusion shall be substantially in the form attached as Exhibit C to this Agreement.

3.5. **Proof Of Mailing**. At least 5 calendar days prior to the Final Fairness Hearing, the Settlement Administrator shall provide a declaration of due diligence and proof of mailing with regard to mailing of the Notice of Class Action Settlement and Request for Exclusion to Class Counsel and Defendants' Counsel, which they shall in turn provide to the Court.

## 4. CLASS MEMBERS' OPTIONS TO RESPOND

4.1. **Class Members' Consideration Period**. Class Members shall be provided 45 calendar days to exercise any rights with regard to the Settlement, following the postmark date of the initial mailing of the Notice of Class Action Settlement and the Request for Exclusion. Except as specifically provided herein, no Class Member responses of any kind that are postmarked more than 45 calendar days after the initial mailing of Class Notice shall be considered. Responses from Class Members must be postmarked for mail with the U.S. Postal Service. Responses sent by facsimile, email, or other forms of electronic transmission will not be considered.

4.2. **Request for Exclusion and Opt Out Rights**. Class Members shall be given the opportunity to opt out of the Settlement.

77946185v.2

4.2.1 **Opt Out Procedures.** Class Members may opt out of the Settlement by mailing to the Settlement Administrator a Request for Exclusion, substantially in the form attached as Exhibit C. Any such Request for Exclusion must be postmarked not more than 45 calendar days after the postmark date of the initial mailing of the Notice of Class Action Settlement and the Request for Exclusion. To be a valid Request for Exclusion, a Class Member must provide his or her name (and former names, if any, that were used in contracting with Defendants), current address, and current telephone number. If there is a dispute regarding the timeliness or validity of a Request for Exclusion, the Settlement Administrator shall make the determination, after consultation with Class Counsel and Defense Counsel. Requests for Exclusion from Class Members must be postmarked for mail with the U.S. Postal Service. Requests for Exclusion sent by facsimile, email, or other forms of electronic transmission will not be considered. Within ten days of the deadline for Requesting Exclusion, the Settlement Administrator shall notify Class Counsel and Defense Counsel of the number of valid Requests.

4.2.2 **Effect of Opt Out.** Any Class Member who opts out of the Settlement may not object to the Settlement, shall not receive the benefit of this settlement, and shall not be bound by the Released Claims provisions in this Agreement. If a Class Member submits both a Request for Exclusion and an Objection, the Class Member's Objection will be valid and be deemed to invalidate the Request for Exclusion.

Each Class Member who does not opt out of the Settlement shall be bound by the applicable Released Claims provisions in this Agreement, including the Released Claims.

4.3. **Objection Rights**. Because the Settlement Class will be certified by the Court, only Class Members shall be entitled to object to the terms of the Settlement.

4.3.1 **Objection Procedures.** Class Members' objections to the Settlement or this Agreement must be made using the procedures set forth in the Notice of Class Action Settlement. Any Objection must be sent to the court and postmarked no later than 45 days after the first postmark date of mailing the Notice of Class Action Settlement. An Objection shall be deemed to be submitted as of the postmarked date. Class Members who submit an Objection remain bound by this Agreement.

Objections from Class Members must be postmarked for mail with the U.S. Postal Service. Objections sent by facsimile, email, or other forms of electronic transmission will not be considered.

4.3.2    **Individuals Who Submit an Objection May Appear by Giving Notice.** Class Members who timely submit an Objection shall have the right to appear at the Final Fairness Hearing either in person or through counsel, but must state their intent to do so at the time they submit their written Objection. Class Members may withdraw their Objections at any time.

4.4.    **Proof of Class Members' Responses**. By not later than 75 calendar days after the initial mailing of the Notice of Class Action Settlement, the Settlement Administrator will prepare and submit a declaration attesting to (by number of relevant individuals) its mailing of the Notice of Class Action Settlement, and its inability to deliver any mailing due to invalid addresses.

4.5.    **Binding Effect of Settlement**. Although some Class Members might not receive the Notice of Class Action Settlement, as provided under this Settlement and Agreement, such individuals shall nonetheless be bound by all of the terms of this Settlement and Agreement and the Final Order and Dismissal with Prejudice.

## 5.    BLOW PROVISION

5.1.    **Defendants' Right to Terminate.** Defendants shall have the option in their sole discretion to terminate this Class Action Settlement if 100 (one hundred) Class Members submit valid and timely Requests for Exclusion. If Defendants exercise the right to terminate, they shall do so by notifying Class Counsel pursuant to Section 9.8 of this Agreement, in writing, within 15 days after the Settlement Administrator has notified Plaintiff and Defendants, in writing, of the number of valid Requests for Exclusion as of the Request deadline.

5.2.    **Effect of Termination by Defendants**. In the event Defendants terminate the Agreement pursuant to this section, the Action shall proceed as if no settlement had been attempted and revert back to its prior procedural posture.

## 6.    SETTLEMENT BENEFITS

6.1.    **Settlement Relief**. The sole settlement relief to the Class shall be modification of version one of the Vivint Solar Residential Power Purchase Agreements ("PPAs at Issue") between the

JOINT STIPULATION OF CLASS ACTION SETTLEMENT AND RELEASE OF CLAIMS

77946185v.2

individual Class Members and Vivint Solar Developer, LLC (and any subsequent assignee of Vivint Solar Developer, LLC).  The standard version of the PPAs at Issue that Class Members executed is attached hereto as Exhibit B. As of the Effective Date, the PPAs at Issue of Class Members shall be amended as follows:

> The final two sentences of Paragraph 11(e) of the PPAs at Issue shall be deleted and replaced with the following:  "The 'Buy-Out Payment' you will pay us will be Four Dollars ($4.00) per Watt installed, discounted by 5% for each year from the In-Service Date of the System. You will own the System and all System Interests once you have paid us the Buy-Out Payment due."

> A new Paragraph 11(f) shall be added to the PPAs at Issue that reads. "(f) **Election of Buy-Out Option**. You may choose to make a Buy-Out Payment at any time during the Term.  Once you have paid us the Buy-Out Payment due, the Agreement shall be terminated and Vivint Solar Developer LLC (and any assignee of Vivint Solar Developer LLC) shall have no further obligations to you under the Agreement, and you shall have no further obligations to Vivint Solar Developer LLC (or any assignee of Vivint Solar Developer LLC) under the Agreement, *except* that, to the extent that your account is in arrears, you shall be required to make all past due payments in order to exercise the Buyout Option."

> Paragraph 12 of the PPAs at Issue shall be amended to add a subparagraph 12(c) that reads, "(c) **Assignment of Buy-Out Option.**  A Property Transferee may exercise the Buy-Out Option on the same terms as the original customer."

> The PPAs at Issue for Class Members shall not be modified in any other respect as a result of this Settlement.

> **Explanatory Notice**.  The parties agree that the 5% per year discount described in this Settlement Agreement is intended to be compounded, such that each year's Buy-Out Price shall be 95% of the previous year's Buy-Out Price.  The notice of settlement provided to Class Members shall provide an explanation consistent with this understanding and a chart that states the Buy-Out Price in each year of the Term of the PPA at Issue.

  6.2. **Attorneys' Fees and Costs**.  Class Counsel may request—and Defendants may oppose—that the Court approve an attorneys' fees and costs award for attorneys' fees and costs.

   6.2.1 **Approval of Attorneys' Fees and Costs Award Not Material.**  The Court's approval of an attorneys' fees or costs award is not a material term of the Settlement or this Agreement.  If the Court does not approve or approves only a lesser amount than that requested by Class Counsel for attorneys' fees or costs, the other terms of the Settlement and this Agreement shall still

apply.  The Court's refusal to approve the attorneys' fees or costs award requested by Class Counsel does not give the Class Representative, the Class Members, or Class Counsel any basis to abrogate the Settlement or this Agreement.

6.3.    **Class Representative Service Award**.  Class Counsel may request—and Defendants may oppose—that the Court approve a Class Representative Service Award for Gerrie Dekker's participation in the Action, including appearing for deposition, and such payments shall not be subject to payroll taxes or withholdings.

6.3.1    **Class Representative Service Award Not Material.**  The Court's approval of the Class Representative Service Awards is not a material term of the Settlement or this Agreement.  If the Court does not approve or approves only a lesser amount than that requested by Class Counsel for the Class Representative Service Award, the other terms of the Settlement and this Agreement shall apply.  The Court's refusal to approve the Class Representative Service Award requested by Class Counsel does not give either of the Class Representative, the Class Members, or Class Counsel any basis to abrogate the Settlement or this Agreement.

6.4.    **Settlement Administration Costs**.  Class Counsel intends to request—and Defendants agree not to oppose—that the Court approve Settlement Administration Costs of up to $7,000 (seven thousand dollars).  Upon completion of administration of the Settlement, the Settlement Administrator shall provide written certification of such completion to Class Counsel and Defendants' Counsel.  The Parties agree to cooperate in the settlement administration process and to make all reasonable efforts to control and to minimize settlement administration costs.

7.    **RELEASES**

7.1.    **Release by Class Members**.  By operation of the entry of the Final Approval Order and Judgment, each Class Member will release Defendants and each of the Released Parties of and from any and all claims, rights, demands, charges, complaints, causes of action, obligations, or liability of any and every kind based on the claims certified by the Court.  This includes California Civil Code section 1671 and violations of the Unfair Competition Law and Consumer Legal Remedies Act predicated on alleged violations of section 1671.

7.2.    **Release by Gerrie Dekker**.  Effective upon entry of the Final Approval Order and Judgment, Plaintiff Gerrie Dekker will release Defendants and each of the Released Parties of and from any and all claims, rights, demands, charges, complaints, causes of action, obligations, or liability of any and every kind that were asserted in the Action, whether or not certified by the Court.  This includes California Civil Code section 1671 and violations of the Unfair Competition Law and Consumer Legal Remedies Act predicated on alleged violations of section 1671.

7.3.    **No Admission of Liability**.  By entering into this Agreement, Defendants in no way admit any violation of law or any liability whatsoever to Class Members, individually or collectively, and expressly deny all such liability.  Neither this Agreement, nor any other Settlement documents, shall be offered in any case or proceeding as evidence of any admission by Defendants of any liability on any claim for damages, penalties, restitution, or any other relief.  Likewise, by entering into this Agreement, Defendants in no way admit to the suitability of this case for class action, collective action, or representative action litigation, other than for purposes of Settlement.  Rather, Defendants enter into this Agreement to avoid further protracted litigation and to resolve and to settle all disputes with the Settlement Class.

The Parties understand and agree that this Agreement and all exhibits thereto are settlement documents and shall be inadmissible for any purpose in any proceeding, except an action or proceeding to approve, interpret, or enforce the terms of this Agreement.  The Parties agree that, to the extent permitted by law, this Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against any action, suit, or other proceeding that may be instituted, prosecuted, or attempted in breach of this Agreement.

## 8.    SETTLEMENT APPROVAL PROCEDURE

8.1.    **Preliminary Approval**.  Plaintiff shall promptly submit to the Court a Motion for Preliminary Approval of class action settlement.  This motion shall seek an order to preliminarily approve the proposed Settlement according to the terms in this Agreement and provide for the Notice of Class Action Settlement and the Request for Exclusion, to be sent to Class Members as specified in this Agreement.  The motion shall also be accompanied by signed declarations by Class Counsel, discussing

77946185v.2

the risks of continued litigation and the decision that the best interests of Plaintiff and the Class Members are served by the terms of this Agreement.

8.2. **Effect of Failure to Obtain Preliminary Approval**. If this Settlement or Agreement or a substantially similar settlement mutually agreed to by the Parties is not preliminarily approved, the Action shall proceed as if no settlement had been attempted and revert back to its prior procedural posture. The Parties may, however, jointly agree to seek reconsideration of the ruling on the Settlement or Court approval of a renegotiated settlement.

8.3. **Final Approval**. If the Court grants preliminary approval, Plaintiff shall submit to the Court a Motion for Final Approval Order. The motion shall request the entry of a Final Approval Order, which shall include findings and orders: (a) approving the Settlement and the Agreement; (b) adjudging the terms to be fair, reasonable, and adequate; (c) reciting the release terms in full; (d) directing that the Settlement terms and provisions be carried out; and (e) retaining jurisdiction to oversee administration and enforcement of the terms of this Agreement and the Court's orders.

8.4. **Motion for Attorneys' Fees and Costs Award**. Concurrent with the filing of the Motion for Final Approval, Class Counsel shall file a motion for Court approval of an attorneys' fees and costs and a motion for any Class Representative Service Award. Defendants retain the right to contest these motions.

8.5. **Entry of Judgment**. At the final approval hearing, the Parties shall request that the Court, among other things: (a) enter final judgment in accordance with this Agreement and without further fees or costs to any party except as expressly set forth in this Agreement; (b) approve this Agreement as fair, reasonable, adequate, and binding on all members of the Settlement Class; (c) enter an order as to Class Counsel's request for an attorneys' fees and costs award; and (d) enter an order as to the request for the Class Representative Service Award.

8.6. **Effect of Failure to Obtain Final Judgment**. In the event the Court fails to enter final judgment in accordance with this Agreement, or such final judgment is vacated or reversed, the Action shall proceed as if no settlement had been attempted and revert back to its prior procedural posture. The Parties may, however, jointly agree to seek reconsideration or appellate review of the ruling or Court approval of a renegotiated settlement.

## 9. MISCELLANEOUS

9.1.    **Interim Stay of Proceedings**.  The Parties agree to refrain from further litigation, except such proceedings necessary to implement and to obtain a Preliminary Approval Order and Final Approval Order of the terms of the Agreement.  If the Settlement is not finally approved, the Parties agree that they will revert to their positions in the lawsuit prior to the time the Settlement was reached, and no agreements set forth in this Agreement or any documents generated or orders issued related to the Settlement will be admissible in any future proceeding in this or any other action.

9.2.    **Parties' Authority**.  The signatories hereto represent that they are fully authorized to enter into this Agreement and are fully authorized to bind the Parties to all terms stated herein.  It is agreed that Class Members are so numerous that it is impossible or impractical to have each Class Member execute this Agreement.  It is agreed that this Agreement may be executed on behalf of Class Members by the Class Representative and Class Counsel.

9.3.    **Entire Agreement**.  This Agreement, which includes the Definitions, Recitals, and all Exhibits attached hereto, constitutes the entire agreement between the Parties with regard to the subject matter contained herein, and all prior and contemporaneous negotiations and understandings between the Parties shall be deemed merged into this Agreement.

9.4.    **Materiality of Terms**.  The Parties have arrived at this Agreement as a result of arm's-length negotiations.  Where stated in this Agreement, certain terms are material and revision of these material terms will allow Defendants the option to void this Agreement.

9.5.    **Counterparts**.  This Agreement may be executed in counterparts, and when each party has signed and delivered at least one such counterpart, each counterpart shall be deemed an original, and when taken together with other signed counterparts, shall constitute one signed Agreement, which shall be binding upon and effective as to all Parties.

9.6.    **Facsimile or Scanned Signatures For This Agreement**.  Any party may sign and deliver this Agreement by signing on the designated signature block and transmitting that signature page via facsimile or as an Exhibit to an e-mail to counsel for the other party.  Any signature made and transmitted by facsimile or as an attachment to an e-mail for the purpose of executing this Agreement

shall be deemed an original signature for purposes of this Agreement and shall be binding upon the party who transmits the signature page.

9.7. **Binding Effect**. This Agreement shall be binding upon the Parties and, with respect to the Class Representative, Class Members, their spouses, children, representatives, heirs, administrators, executors, beneficiaries, conservators, attorneys, and assigns.

9.8. **Waivers and Modifications to Be in Writing**. No waiver, modification, or amendment of the terms of this Agreement, whether purportedly made before or after the Court's approval of this Agreement, shall be valid or binding, unless in writing, signed by or on behalf of all Parties and then only to the extent set forth in such written waiver, modification, or amendment, subject to any required Court approval. Any failure by any Party to insist upon the strict performance by the other Party of any of the provisions of this Agreement shall not be deemed a waiver of future performance of the same provisions or of any of the other provisions of this Agreement, and such Party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement. The time periods and dates provided in this Agreement with respect to giving of notices and hearings are subject to Court approval and modification by the Court or by written stipulation of Class Counsel and Defendants' Counsel.

Any notice to be given pursuant to this Agreement (excepting the Class Notice) shall be made by email and overnight delivery to Class Counsel or Defendants' Counsel. If Class Members have questions about this Agreement, they must contact Class Counsel, rather than Defendants. Defendants shall have no obligation to respond to communications by Class Members.

9.9. **Construction**. The determination of the terms and conditions of this Agreement has been by mutual agreement of the Parties. Each party participated jointly in the drafting of this Agreement, and the terms and conditions of this Agreement are not intended to be, and shall not be, construed against any party by virtue of draftsmanship.

9.9.1 **Exhibits Incorporated by Reference.** The terms of this Agreement include the terms set forth in any attached exhibit, which are incorporated by this reference as though fully set forth herein. Any exhibit to this Agreement is an integral part of the Settlement.

9.9.2 **Captions.** The captions or headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

9.10. **Further Acts and Cooperation Between the Parties**. The Parties shall cooperate fully with each other and shall use their best efforts to obtain the Court's approval of this Agreement and all of its terms. Each of the Parties, upon the request of another, agrees to perform such further acts and to execute and to deliver such other documents as are reasonably necessary to carry out the provisions of this Agreement.

9.11. **Continuing Jurisdiction**. The Court shall retain jurisdiction over the implementation of this Agreement as well as any and all matters arising out of, or related to, the implementation of this Agreement and Settlement. The Court shall not have jurisdiction to modify the terms of the Agreement without the consent of all of the Parties.

9.12. **Disputes**. If the Parties have a dispute with regard to the language of this Agreement, they agree to first attempt to resolve the dispute informally through good-faith negotiations, but if those efforts are unsuccessful, they agree to mediate any such dispute. The Parties will split the costs of the mediator, and all parties will bear their own fees and costs.

9.13. **Governing Law**. This Settlement and Agreement was made and entered into in the State of California. All terms of this Agreement shall be governed by and interpreted according to the substantive laws of the State of California without regard to its choice of law principles.

**SO AGREED AND STIPULATED:**

DATED: September 8, 2022

PLAINTIFF GERRIE DEKKER

*Gerrie Dekker*

By: Gerrie Dekker (Sep 8, 2022 17:19 PDT)
_____
Gerrie Dekker

_____

DATED: September 8, 2022

DEFENDANTS

*Jeffrey R. Makin*

By: Jeffrey R. Makin (Sep 8, 2022 18:24 MDT)
_____

Print Name: Jeffrey R. Makin
_____

Title: Senior Vice President, Legal
_____

DATED: September 8, 2022

MATERN LAW GROUP

By: _____
   Matthew J. Matern
   Joshua D. Boxer
   Corey B. Bennett

Attorneys for Plaintiff and the Class

DATED: September 8, 2022

THE NORTON LAW FIRM PC

*Fred Norton*

By: _____

Fred Norton
Bree Hann
George C. Harris
Esther Chang

Attorneys for Defendants

# EXHIBIT A

## EXHIBIT A

*Gerrie Dekker, v. Vivint Solar, Inc., et al*.
United States District Court, Northern District of California
Case No. 3:19-cv-07918-WHA

## NOTICE OF SETTLEMENT OF CLASS ACTION

**If you are currently subject to Version 1 of the Residential Solar Purchase Power Agreement with Vivint Solar, this class action settlement may affect your rights.**

*A court authorized this notice. This is not a solicitation from a lawyer. You are not being sued.*

### Please read this notice carefully.

**THIS NOTICE is of a proposed Settlement of a class action lawsuit in which you may be entitled to receive certain relief ("Settlement"). Your rights may be affected by the legal proceedings in this action. Please review this notice carefully.**

Defendants' records indicate you are a member of the class certified by the Court.

Defendants deny the allegations and deny any wrongdoing. The Court has not decided whether Defendants did anything wrong.

### 1.      Why Did I Get This Notice?

The purpose of this Notice is to inform you of a proposed settlement reached in the United States District Court for the Northern District of California against Defendants. This Notice is to advise you how your rights may be affected by this settlement.

### 2.      What Is This Lawsuit About?

In this lawsuit, Plaintiff Gerrie Dekker alleges that Version 1 of Defendants' Residential Solar Power Purchase Agreement ("PPA"), which was used with customers who initially contracted with Vivint Solar in 2012 and 2013, imposes unlawful liquidated damages provisions on consumers who are in default or who seek to transfer the contract to parties who are unwilling to assume the contract's obligations. Dekker contends that such provisions violate California law.

### 3.      How Do Defendants Answer?

Defendants deny Plaintiff's allegations and state that the contract provisions are not liquidated damages but lawful alternatives for performance of the contract and that, even if considered provisions for liquidated damages, they are reasonable and lawful. Further, Defendants contend that even if the contract provisions at issue are unenforceable, Defendants would still be entitled to damages for consumer contract breaches in similar amounts.

### 4.      Has the Court Decided Who Is Right?

The Court has not ruled on the merits of Plaintiff's claims or Defendants' defenses. The Court has granted preliminary approval of the Settlement and authorized the issuance of this notice.

### 5.      What Is A Class Action?

A class action is a lawsuit brought by one or more plaintiffs on behalf of a group or "class" of other similarly situated people seeking to have their claims and rights against the same defendant decided in one proceeding. In a class action, the plaintiffs and their attorneys represent the interests of the class.

As a result of certifying a case as a class action, the Court may resolve the certified claims of all class members collectively and at the same time. Whether the class wins or loses the case, all class members are bound by the decision or judgment entered in the case and may not file their own lawsuit about the same claims that were decided in the class action.

## 6. Am I Part of the Class?

The Court certified the following class:

All persons in California currently in privity of contract with Vivint Solar because they are subject to Version 1 of the Vivint Solar Residential Solar Power Purchase Agreement.

According to Defendants' records, you are a member of the class.

## 7. What Are My Options?

1. If you take no further action, you will remain a Class Member, represented by Class Counsel.

Your Purchase Power Agreement (PPA") will be modified as described below and you will be bound by the release provisions of the Settlement Agreement with respect to any and all claims, rights, demands, charges, complaints, causes of action, obligations, or liability of any and every kind based on the claims certified by the Court. This includes California Civil Code section 1671 and violations of the Unfair Competition Law and Consumer Legal Remedies Act predicated on section 1671.

2. You may submit a Request for Exclusion to "opt out" of this Settlement. If you do not want to remain a Class Member, you must submit the enclosed Request for Exclusion to "opt out" of the Settlement.

If you submit a timely and valid Request for Exclusion, your PPA will **not** be modified.

If you opt out, you may not object to the Settlement and will not be bound by the release provisions in the Settlement Agreement. You will be free to pursue any claims you may have against Defendants on your own behalf, but Class Counsel will not represent you.

In order to exclude yourself from the Class, you must submit the completed Request for Exclusion to the Settlement Administrator, Phoenix Class Action Administrative Solutions ("Phoenix"), so that it is **postmarked** no later than [INSERT DATE]. **If you do not comply with these procedures and the deadline for exclusions, you will lose any opportunity to exclude yourself from the Settlement, and your rights will be determined in this lawsuit by the Settlement Agreement if it is approved by the Court.**

3. You may object to the Settlement by timely submitting a written objection.

In order to make a timely and valid objection, you must complete and submit a written objection and send it to the Court, _____, **postmarked** no later than [INSERT DATE]. If you wish to appear at the Settlement Hearing and be heard orally in support of, or in opposition to the Settlement, you must state so in the objection. **If you do not comply with these procedures for submitting an objection, and the deadline for objections, you will lose any opportunity to have your objection considered by the Court or otherwise to contest the approval of the Settlement or to appeal from any orders or judgments entered by the Court in connection with the Proposed Settlement.**

If the Court grants final approval of the Settlement despite your objection, your PPA will be modified and you will be bound by the release.

**PLEASE NOTE**: If you do not wish to be represented by Class Counsel, you may hire your own attorney at your own expense. Your attorney must send a Notice of Appearance to the Settlement Administrator, Phoenix, so that it is **postmarked** on or before <mark>[INSERT DATE]</mark>. You will be responsible for any attorneys' fees and costs charged by your attorney.

## 8. Who Represents the Class?

The Court appointed the following attorneys to represent Plaintiffs and the class ("Class Counsel"):

Matthew J. Matern
Joshua D. Boxer
Corey B. Bennett
**Matern Law Group, PC**
1230 Rosecrans Avenue, Suite 200
Manhattan Beach, California 90266
Tel: (310) 531-1900
Fax: (310) 531-1901
info@maternlawgroup.com

## 9. Who Represents Defendants?

Fred Norton
Bree Hann
George Harris
Esther Kim Chang
**THE NORTON LAW FIRM PC**
299 Third Street, Suite 200
Oakland, CA 94607
Tel: (510) 906-4900
Fax: (510) 906-4910

## 10. How Will The Lawyers Be Paid?

You will not be required to pay the lawyers any money. They will petition the Court to award them fees and reimburse them for their costs to be paid by Defendants. Although you are not required to do so, you may retain your own counsel. If you choose to retain your own counsel, your attorney must make a formal appearance in Court and you may be responsible for any fees incurred by your own attorney.

## 11. Who is covered by the class action lawsuit and the proposed Settlement?

**A.    The Settlement Class**. The Court granted preliminary approval of the Settlement and authorized this Notice. The Court defined the "Settlement Class" as including all persons in California currently subject to Version 1 of the Residential Solar Purchase Power Agreement with Vivint Solar who did not file a timely and valid opt-out Request for Exclusion.

**B.    The Effect of Membership in the Settlement Class**. If you come within the definition of the Settlement Class, and the Court grants final approval of the Settlement, your PPA will be modified unless you file the enclosed Request for Exclusion to opt out of the Settlement Class. Members of the Settlement Class will have their PPAs modified as follows:

The final two sentences of Paragraph 11(e) of the PPAs at Issue shall be deleted and replaced with the following: "The 'Buy-Out Payment' you will pay us will be Four Dollars ($4.00) per Watt installed, discounted by 5% for each year from the In-Service Date of the System. You will own the System and all System Interests once you have paid us the Buy-Out Payment due."

A new Paragraph 11(f) shall be added to the PPAs at Issue that reads. "(f) **Election of Buy-Out Option**. You may choose to make a Buy-Out Payment at any time during the Term. Once you have paid us the Buy-Out Payment due, the Agreement shall be terminated and Vivint Solar Developer LLC (and any assignee of Vivint Solar Developer LLC) shall have no further obligations to you under the Agreement, and you shall have no further obligations to Vivint Solar Developer LLC (or any assignee of Vivint Solar Developer LLC) under the Agreement, *except* that, to the extent that your account is in arrears, you shall be required to make all past due payments in order to exercise the Buyout Option."

Paragraph 12 of the PPAs at Issue shall be amended to add a subparagraph 12(c) that reads, "(c) **Assignment of Buy-Out Option.** A Property Transferee may exercise the Buy-Out Option on the same terms as the original customer."

The PPAs at Issue for Class Members shall not be modified in any other respect as a result of this Settlement.

Persons who exclude themselves from the Class will not be bound by the Settlement and will not have their PPA modified, but may pursue their own timely individual claims against Defendants.

The Court can only approve or deny the settlement and cannot change the terms of the settlement.

## 12. What Will be the Impact on my PPA if the Court grants final approval?

If the Court grants final approval of the settlement, your PPA will operate differently if you default or choose to buy out the system.

Instead of paying Seven Dollars ($7.00) per kilowatt hour installed, you will pay Four Dollars ($4.00) per Watt installed, discounted by 5% for each year from the In-Service Date of the System. This is illustrated in the table below:

| Years Since In-Service Date Under PPA v.1 | Buyout Payment (Dollars per Watt of installed capacity) |
|---|---|
| 8 | $2.65 |
| 9 | $2.52 |
| 10 | $2.39 |
| 11 | $2.28 |
| 12 | $2.16 |
| 13 | $2.05 |
| 14 | $1.95 |
| 15 | $1.85 |
| 16 | $1.76 |
| 17 | $1.67 |
| 18 | $1.59 |
| 19 | $1.51 |

## 13. What If I Need Additional Information?

If you have any questions, you may contact Class Counsel at the address or phone number listed above in Section 8 or the Class Action Administrator by telephone at 1-XXX-XXX-XXXX or by writing to:

[Administrator]
[Administrator Contact Info]

You may also access the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or visit the office of the Clerk of the Court for the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA, 94102, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS.

PLEASE NOTE THAT THE DATE OF THE FINAL APPROVAL HEARING MAY CHANGE WITHOUT FURTHER NOTICE TO THE CLASS. IT IS YOUR RESPONSIBILITY TO CHECK THE PACER SYSTEM TO CONFIRM THE DATE HAS NOT BEEN CHANGE

DATED: _____, 2022                    BY ORDER OF THE COURT
                                                UNITED STATES DISTRICT COURT
                                                NORTHERN DISTRICT OF CALIFORNIA

# EXHIBIT B

**vivint.** solar

4931 North 300 West, Provo, UT 84604
Phone: 877.404.4129
Fax: 801.765.5758
Email: support@vivintsolar.com

CA License #: 973756

AR # _____

## POWER PURCHASE AGREEMENT

### CUSTOMER

THIS AGREEMENT is made and entered into this _____ day of _____, 20 ____ by and between Vivint Solar Developer, LLC ("Vivint Solar," "Seller," "we", or "us") and the following person(s) ("Customer" or "you"):

Customer Name (First, MI, Last) _____  Customer Name (First, MI, Last) _____
Homeowner: ☐Yes ☐No  Homeowner: ☐Yes ☐No
INSTALLATION ADDRESS _____
STATE _____ ZIP _____ PHONE _____ CITY _____ COUNTY _____
BILLING ADDRESS (IF DIFFERENT) _____

### 1. INSTALLATION AND SERVICES

We will design and install a Solar Photovoltaic system, including all solar panels, inverters and, if necessary, a racking system, and related metering equipment necessary to measure the electric energy generated, as well as all material and component parts, such as wiring and flashing mounts installed on your roof (collectively, the "System"), as more fully described in the Work Order ("WO").

We will design and install the System at no cost to you. We will pay any costs incurred to obtain permits necessary for installation and System modifications that your electric public utility (or its successors or assigns) (the "Electric Distribution Company") may charge to interconnect the System. We will complete all inspections and obtain all certifications necessary, including all government permits, to complete installation of the System, enable its interconnection with the Electric Distribution Company, and to commence generation of energy measured in kilowatt hours (kWh) (the "Energy"). You will assist with our application for permits, if required. We will design, install and connect the System in material compliance with all applicable laws (including all permits and, if applicable, all requirements under any state renewable energy incentive programs) and the Electric Distribution Company's requirements. You will pay all taxes assessed on or arising from installation or operation of the System, including any sales tax on the Energy produced by the System. However, we are responsible for income tax or property tax assessed in relation to our ownership of the System.

### 2. PRICE, PAYMENT, FINANCIAL DISCLOSURES AND TERMS

**2.1 ACTIVATION.** Any activation and/or interconnection fees charged by your Electrical Distribution Company will be paid by Vivint Solar.

**2.2 INSTALLATION & EQUIPMENT.** Vivint Solar will pay all costs and fees associated with the installation of the System.

**2.3 ENERGY FEE.** YOU WILL PAY US THE ENERGY PRICE AS DEFINED BELOW:

ENERGY PRICE PER KILOWATT HOUR ("kWh"): $ $____ *plus any applicable taxes*

THE ENERGY PRICE IS SUBJECT TO AN ANNUAL INCREASE OF 2.9%. THE TOTAL MONTHLY ENERGY COST IS DETERMINED BY THE AMOUNT OF ENERGY PRODUCED BY THE SYSTEM. THE FIRST BILLING CYCLE BEGINS ON THE IN-SERVICE DATE (AS DEFINED BELOW). YOUR MONTHLY BILL WILL REFLECT CHARGES FOR ENERGY PRODUCED BY THE SYSTEM FROM THE PREVIOUS MONTH. **THERE IS NO FINANCING CHARGE WITH THIS AGREEMENT.**

**2.4 TERM FOR SERVICES. THIS AGREEMENT STARTS ON THE DAY IT IS SIGNED AND CONTINUES FOR TWENTY (20) YEARS FOLLOWING THE IN-SERVICE DATE ("TERM").** The In-Service Date is the first day after all of the following have been achieved: (i) the System has been installed and is capable of generating Energy, (ii) all permits necessary to operate the System have been obtained, (iii) the System has been interconnected with the Electric Distribution Company, and (iv) all inspections, back-up documentation, and certificates required under applicable law or by the Electric Distribution Company have been completed or given. We may, at our election, terminate this Agreement prior to the In-Service Date following delivery of prior written notice to you. Upon such termination of this Agreement, we will remove any portion(s) of the System that have been installed and shall restore your home's roof to a good and watertight condition. If we elect to terminate this Agreement in accordance with this paragraph, we will have no further liability to you. Installation of the System begins when we or any of our contractors attach or fasten any part of the System to your home. If you elect to terminate this Agreement after ten (10) business days following this transaction, but before installation of the System begins, you will pay to reimburse us for all costs that we have incurred in performing our duties under this Agreement, not to exceed six hundred dollars ($600). After you pay us this fee, you will have no further liability to us arising from or relating to this Agreement.

**2.5 PURCHASE OPTION.** You have the option to purchase the System at the end of the Term for the fair market value of the System determined at the time of such purchase (the "Purchase Option"). You may exercise your Purchase Option by providing written notice to us at least sixty (60) days prior to the end of the Term. Upon receipt of such notice, we will select an independent appraiser to determine the fair market value of the System. The valuation made by the appraiser (the "Purchase Option Price") will be provided to you in writing and will be binding. Provided we receive your payment of the Purchase Option Price, and all other amounts then owing and upon payment hereunder, within fifteen (15) days of delivery of the notice of the Purchase Option Price to you, title to the System will transfer to you at the end of the Term.

**2.6 CREDIT CHECK; LATE FEES.** YOU AUTHORIZE US TO CONFIRM YOUR CREDIT RECORD, AND TO REPORT YOUR PAYMENT PERFORMANCE UNDER THIS AGREEMENT TO CREDIT AGENCIES AND CREDIT REPORTING SERVICES. IF YOU FAIL TO MAKE ANY PAYMENT WHEN DUE, WE MAY, BY GIVING YOU WRITTEN NOTICE, DISCONTINUE INSTALLATION, METERING, REPAIR SERVICE, TERMINATE THIS AGREEMENT, AND RECOVER ALL DAMAGES TO WHICH WE ARE ENTITLED, INCLUDING THE VALUE OF THE WORK PERFORMED AND OUR LOSS OF PROFIT AS MORE FULLY DESCRIBED IN SECTION 11(e). IN ADDITION, WE MAY IMPOSE A TWENTY-FIVE DOLLAR ($25.00) LATE CHARGE ON ALL PAYMENTS MORE THAN TEN (10) DAYS PAST DUE.

**2.7 YOUR CALIFORNIA PRIVACY RIGHTS.** Cal. Civ. Code §1798.83 provides that you are entitled to request information about whether a business has disclosed personal information to any third parties for the third parties' direct marketing purposes. If the business has made such a disclosure, upon receipt of such a request, the business is required to provide a list of all third parties to whom personal information was disclosed in the preceding calendar year, as well as a list of the categories of personal information that were disclosed ("Disclosure Information"). You may request Disclosure Information or may prevent the sharing of personal information by emailing support@vivintsolar.com.

### 3. REMOVAL OF THE SYSTEM

Except as provided in this Section, during the Term you will not remove any portion of the System from your home. If you want to make repairs or improvements to your home or your roof that require the temporary removal of the System or that could interfere with the performance or operation of the System, you must give us at least thirty (30) days prior written notice so that we can remove the System prior to commencement of the repair or improvement and replace the System after the repair or improvements have been completed. You must pay us a fee of four hundred and ninety-nine dollars ($499.00), subject to an annual increase of 2.9%, to reimburse us for all costs of removing, storing, and reinstalling the System. In the case of an emergency that may require temporary removal or relocation of the System, you must contact us immediately. However, if we are unable to timely respond to the emergency, you may, at your own expense, contract with a licensed solar installer to remove the System as necessary to make repairs required by the emergency. You will be responsible for any damage to the System that results from actions taken by you or your contractor. You must notify us by calling us at 877.404.4129 within forty-eight (48) hours of taking any such action. Unless you elect the Purchase Option, we will remove the System from your home within ninety (90) days of the end of the Term.

### 4. LIMITATION OF LIABILITY

EXCEPT AS EXPLICITLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT, OR CONSEQUENTIAL DAMAGES, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. SECTIONS 16 AND 17 ON THE REVERSE SIDE OF THIS AGREEMENT LIMIT OUR LIABILITY. EVEN IF A COURT DECIDES THAT OUR BREACH OF THIS AGREEMENT, OR A FAILURE OF THE SYSTEM, OR OUR NEGLIGENCE, OR A FAILURE OF THE INSTALLATION, OR REPAIR SERVICE CAUSED OR ALLOWED ANY HARM OR DAMAGE (WHETHER PROPERTY DAMAGE, PERSONAL INJURY OR DEATH) TO YOU OR ANYONE IN OR ON YOUR PREMISES, YOU AGREE THAT OUR LIABILITY SHALL BE LIMITED TO THE AMOUNT YOU HAVE PAID FOR THE ENERGY PRODUCED BY THE SYSTEM. YOU HAVE HAD THE OPPORTUNITY TO DISCUSS THIS LIMITATION WITH OUR SALES AGENT.

### 5. NOTICE TO CUSTOMER

**1. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT OR IF ANY OF THE SPACES INTENDED FOR THE AGREED TERMS TO THE EXTENT OF THEN AVAILABLE INFORMATION ARE LEFT BLANK.**

**2. YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT.**

**3. IT SHALL NOT BE LEGAL FOR THE SELLER TO ENTER YOUR PREMISES UNLAWFULLY OR COMMIT ANY BREACH OF THE PEACE TO REMOVE GOODS INSTALLED UNDER THIS AGREEMENT.**

**4. YOU MAY CANCEL THIS AGREEMENT AT ANY TIME BEFORE MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**ALL OF THE TERMS ON THE REVERSE SIDE OF THIS PAGE ARE PART OF THIS AGREEMENT. READ THEM BEFORE YOU SIGN BELOW.**

**VIVINT SOLAR DEVELOPER, LLC**

By: _____
    Signature

By: _____
    Printed Name

**CUSTOMER(S) SIGNATURE(S)**

By: _____
Printed Name: _____

By: _____
Printed Name: _____

Transaction Date: _____ 20 ___

FOR INFORMATION ABOUT CONTRACTORS CONTACT THE CONTRACTORS STATE LICENSE BOARD AT (800) 321-CSLB [2752].

PPA Rev. 02/12

### THREE-DAY RIGHT TO CANCEL
### DATE OF TRANSACTION_____, 20 ___

You, the buyer, have the right to cancel this contract within three business days. You may cancel by e-mailing, mailing, faxing, or delivering a written notice to the contractor at the contractor's place of business by midnight of the third business day after you received a signed and dated copy of the contract that includes this notice. Include your name, your address, and the date you received the signed copy of the contract and this notice.

If you cancel, the contractor must return to you anything you paid within 10 days of receiving the notice of cancellation. For your part, you must make available to the contractor at your residence, in substantially as good condition as you received it, any goods delivered to you under this contract or sale. Or, you may, if you wish, comply with the contractor's instructions on how to return the goods at the contractor's expense and risk. If you do make the goods available to the contractor and the contractor does not pick them up within 20 days of the date of your notice of cancellation, you may keep them without any further obligation. If you fail to make the goods available to the contractor, or if you agree to return the goods to the contractor and fail to do so, then you remain liable for performance of all obligations under the contract.

**I HEREBY CANCEL THIS TRANSACTION DATED:** _____,

AR # _____

**CUSTOMER'S SIGNATURE**

PPA Rev. 06/12

**6. Vivint Solar Services.** (a) **Metering**. We will install performance meter(s) with industry standard telemetry, as needed, to measure the Energy output at the interconnection point with the Electric Distribution Company ("Point of Delivery"). We will collect performance meter data remotely or use our personnel to collect the information and will make the data available to you upon request. You agree to allow our personnel access to your property to collect such data. Although we may test the accuracy of the performance meters from time to time, if performance meter testing indicates that the meter is inaccurate by more than +/- 5%, we will, at no cost to you, repair and recalibrate the performance meter. We shall also make retroactive adjustments to your payments based on corrected meter data for the period of such inaccuracy or one-half the number of days since the meter was last tested, whichever is less. If the performance meter is inoperable for any reason, including your failure to maintain working broadband internet and electrical connections, we may charge you for the estimated amount of Energy generated during that period as based on the formula in Section 14(b) ("Estimated Energy"). WARRANTY. EXCEPT FOR THE REPAIR SERVICE EXPRESSLY SET FORTH IN SECTION 9 OF THIS AGREEMENT, WE MAKE NO WARRANTY TO YOU OR ANY OTHER PERSON, WHETHER EXPRESS, IMPLIED OR STATUTORY, AS TO THE INSTALLATION, DESIGN, OPERATION, OR MAINTENANCE OF THE SYSTEM, THE GENERATION AND DELIVERY OF ENERGY, OR ANY SERVICES PROVIDED UNDER OR DESCRIBED IN THIS AGREEMENT, OR AS TO ANY OTHER MATTER, ALL OF WHICH ARE EXPRESSLY DISCLAIMED BY US. OUR LIABILITY FOR ANY BREACH OF OUR WARRANTIES IS LIMITED TO REPAIRING THE SYSTEM TO THE EXTENT REQUIRED UNDER THIS AGREEMENT. Only we have the right to enforce any warranty provided by our contractors or suppliers on the manufacture or installation of the System. (c) **Casualty Losses.** If the System is damaged by a casualty event covered by insurance, we will promptly repair and replace the damaged portions of the System as necessary to restore it to good working condition. If the System is damaged by a casualty event not covered by our insurance, we may, at our option, repair and restore the System to good working condition or may terminate this Agreement and, at your election, either convey the System on its then-existing condition, as is, to you for no additional consideration or remove the System from your property. If your home is subject to a casualty event that forces removal of the System, you will have the benefit of the estimated amount of Energy that the System would have generated for the amount of time required to perform necessary repairs and/or replacement, and the Term shall be extended day-for-day for the period of such repairs. (d) **Disconnection of System.** We may cause the System to be disconnected from the Electric Distribution Company's facilities if they require such disconnection or we are required to do so under applicable law.

**7. Customer Duties.** (a) **Use of the System**. All Energy that you consume will be used for residential purposes only and will not be used to heat a swimming pool. Your home must remain grid-connected to the Electric Distribution Company. (b) **Broadband Internet Connection**. You must provide us continuous access to a working Broadband Internet Connection. If you fail to maintain the required broadband Internet or electrical connection(s) for a period of time, we may charge you for Energy Price for an estimated amount of Energy as determined under Section 6(a). (c) **System Alterations.** You shall not alter, modify, remove, add or attach anything to the System (collectively "Alterations") without our prior written approval. Any Alterations that you make will become part of the System, and you bear responsibility for them. You may not take any action that could void or impair any warranty relating to the System or its installation. You will be responsible for any damage to the System that is caused by you or your guests, invitees, contractors, or agents, whether such damage is caused before or after the In-Service Date as set forth in Section 2.4. (d) **Duty to Notify.** If required, you must obtain from your homeowners' association, and from your mortgagor or any other person with a property interest in your home, those authorizations, if any, necessary for us and our contractors to install, operate, and maintain the System. Your failure to obtain these authorizations in a timely manner may result in cancellation of this Agreement. If your property has any ordinance or permit violations that prevent proper System permitting, you will remedy such violations. If you fail to remedy any such violations, you will pay us the Buy-Out Payment (as set forth in Section 11(e)). (e) **Incentive Ownership**. In most cases, you will provide us with a receipt from your Electric Distribution Company and shall sign any application or agreement as may be necessary for us to obtain any rebates, credits, offsets, allowances, or renewable energy credits or certificates that are attributed or allocated to the System due to the environmental attributes of the Energy that the System generates ("Environmental Attributes") or any available financial incentives relating to the installation and ownership of the System (including governmental, utility, and nongovernmental programs offering credits, grants, and rebates) and all federal, state, and local tax benefits or attributes (including deductions, credits, and other allowances) relating the System ("Tax and Financial Incentives"), including under your state's renewable energy incentive program, if applicable. (f) **Increase in Cost.** Energy costs and renewal fees are subject to an annual increase of 2.9%. You also acknowledge that the information you provided to us may be subject to change at any time. (g) **Taxes.** Except as otherwise provided herein, you will pay any present and future sales, use, or other tax assessed on the Energy that you purchase. We are not liable for any utility or government assessed taxes or fees.

**8. Sale of Solar Energy.** (a) **Sale of Electricity**. Throughout the Term of this Agreement, we will sell to you and you will buy from us all the Energy produced by the System. The Point of Delivery will be as indicated in the WO and design plans. Title to and risk of loss with respect to the Energy shall transfer from us to you at the Point of Delivery. (b) **Delivery of Electricity**. Energy from the System will be delivered to you in compliance with all requirements of the Electric Distribution Company. (c) **Limits on Obligation to Deliver**. We do not warrant or guarantee the amount of Energy produced by the System for any hourly, daily, monthly, annual or other period. Production of Energy from the System fluctuates and does not assume any obligations of a utility or public service company to supply your energy requirements. Vivint Solar is not subject to rate recovery or governmental influences.

**9. Operation & Maintenance.** Following the In-Service Date and during the Term, we will operate and maintain the System at our cost and expense. We shall maintain the System in good condition, and will operate the System in material compliance with all applicable laws and permits and the Electric Distribution Company's requirements. You will not be required to pay any costs or expenses arising from the operation or maintenance of the System other than payment of the Energy Price for the Energy that the System generates. You will, however, be responsible for and bear the cost of any repairs, replacements or maintenance required if something is interfering with the operation of the System or if there is an emergency affecting or caused by the System, (ii) take any steps necessary to ensure that shading of the System is no worse than anticipated in any shading assessment performed by us by trimming all trees and other vegetation on your property, not installing other structures on your roof, and any other shading reduction activities as needed, and (iii) enter into an agreement acknowledging the System's interconnection with the Electric Distribution Company if they request such an agreement.

**10. Ownership of System.** We will own and hold all property rights in the System, whether such rights or interests constitute direct ownership of a leasehold interest in the System. In addition, we will own and hold all associated rights, privileges, assets, incentives, **rebate**s, and benefits arising from, relating to, or attributable to the System, including Environmental Attributes and Tax and Financial Incentives ("System Interests"). You authorize us to make filings (such as financing statements, easements, notices or liens) with relevant governmental authorities as may be necessary to provide public notice of our ownership or leasehold interest in the System and other System Interests, including but not limited to all Environmental Attributes and Tax and Financial Incentives. You agree to make any necessary assignment or take further action as may be necessary to document our interest in the System Interests. Upon termination of this Agreement or your exercise of the Buy-Out Option, each such filing will be terminated. During the term of this Agreement, you will have no property interest in the System or System Interests except for the Energy that the System generates and in any credits or payments available under applicable net metering programs. You must notify us if you believe the Energy that the System generates. You must keep the System and System Interests free of any liens or other encumbrances. Any liens, encumbrances, or permit violations currently on the property must be fully disclosed. Any failures to disclose such information may result in termination of this Agreement, and you will pay us the Buy-Out Payment. You agree that the System will be marked and identified as our property. You will not change, remove, or alter any of these markings or identifications. **You agree that, to the fullest extent permitted by law, the System and the System Interests will remain our personal property and will not be deemed what the law would consider a fixture attached to the house in the System is attached to your property.**

**11. Suspension or Cancellation of this Agreement.** (a) **Customer Default**. Customer Default means the occurrence of any of the following: (i) Your failure to make, when due, any payment under this Agreement and such failure is not remedied within thirty (30) days after we give you written notice of such failure; (ii) Your failure to perform any of your material obligations under this Agreement and such failure is not cured within thirty (30) days after we give you written notice of such failure; (iii) You deny us, our contractors, governmental authorities, or the Electric Distribution Company access to your property and such access is not given within thirty (30) days after we give you written notice of the failure to provide such access; or (iv) Your bankruptcy, insolvency or admission of your inability to pay your debts as they mature. (b) **Remedies for Customer Default**. If a Customer Default occurs, we may exercise any of the following remedies: (i) terminate this Agreement and demand you pay the Buy-Out Payment; (ii) have the System removed from your home, but deny you access to and use of the Energy it produces, which may be redirected and sold to third parties at our election; (iii) remove the System from your home; or (iv) exercise any other remedy provided under applicable law. Notwithstanding the foregoing, your liability arising from a Customer Default will not exceed the Buy-Out Payment that you will be required to pay upon such Customer Default plus any amounts due and owing under this Agreement that you have not yet paid (including unpaid amounts for Energy that you consumed and late payment on such amounts). (c) **Termination Due to Our Default**. Our default means the occurrence of any of the following: (i) Our failure to perform any of our material obligations under this Agreement and the effect of such failure is not cured within thirty (30) days after you give us written notice of such failure; or (ii) Our bankruptcy, insolvency or admission of our inability to pay our debts as they mature (each a "Default"). (d) **Remedies for Vivint Solar Default**. If a Vivint Solar Default occurs and is continuing, you may: (i) terminate this Agreement and require removal of the System from your home; or (ii) except as provided below, exercise any other remedy provided under applicable law. Notwithstanding the foregoing and in the event of termination as a result of the termination of this Agreement, except for (i) the costs of removing the System from your home if you elect to have it removed under Section 5 and we or our contractor fails to remove it from your home within ninety (90) days of the termination of this Agreement and (ii) any damages to your home resulting from the removal of the

System by us or our contractor. (e) **Buy-Out Payments**. If this Agreement is cancelled or terminated for any reason other than Force Majeure or a Vivint Solar Default you will pay us a Buy-Out Payment. The "Buy-Out Payment" you will pay us the Seven Dollars ($7.00) per watt installed. You will own the System and all System Interests once you have paid us the Buy-Out Payment due.

**12. Assignment & Transfer.** (a) **Assignment**. We may assign, sell, or transfer the System and this Agreement, or any part thereof (including the limited warranty), without your consent and without notice. If such assignee agrees in writing to assume our rights under this Agreement, we will have no further liability or obligation under this Agreement upon the effectiveness of such assignment. (b) **Customer Property Transfer**. You shall provide us with thirty (30) days' prior written notice of a proposed fee simple sale or other transfer (including a lease) of your home. This written notice shall include the name of the proposed purchaser or transferee (the "Property Transferee") and the proposed date of sale or transfer. You will also provide, or cause Property Transferee to provide, any additional information regarding the Property Transferee that we reasonably request. If you are planning to sell your home to a Property Transferee, you will request that the Property Transferee agree in writing with us that Property Transferee will assume your obligations under this Agreement. Property Transferee shall enter into this agreement on or before the date your home is sold. Alternatively, if we determine, that Property Transferee is not adequately creditworthy to assume your obligations under this Agreement upon the sale of your home, or if Property Transferee refuses to assume your obligations under this Agreement, we may terminate this Agreement on written notice to you and you will be obligated to pay us a relocation buy-out payment of Four Dollars ($4.00) per watt installed. Regardless of any other provision in this Agreement, if the proposed transfer of your home to Property Transferee is a lease or other transfer that is not a fee simple sale, you will remain responsible for performance of your obligations under this Agreement following such lease or other transfer.

**13. Changes in the System.** If you or any governmental agency or insurance interest wants us to change the System described herein, or change it after it is installed, you agree to pay our standard parts and labor charges for such changes.

**14. Shutdowns, Closure or Sale of Site.** (a) **If You Request Shutdown**. You may request us to temporarily stop operation of the System from time to time for a period no longer than thirty (30) days, such request to be reasonably related to your activities in maintaining and improving your premises ("Site"). During any such shutdown period (but not including periods of Force Majeure), you will pay us an amount equal to the sum of (i) payments that you would have made to us hereunder for the Energy that would have been produced by the System during the period of the shutdown; (ii) revenues that we would have received with respect to the System under the state renewable energy incentive program and any other assistance programs with respect to the Energy that would have been produced during the period of the shutdown; and (iii) the value to us of any Environmental Attributes and Tax and Financial Incentives that we would have received with respect to the Energy that would have been produced by the System during the period of the shutdown. Determination of the amount of Energy that would have been produced during the period of the shutdown shall be based, during the first year after the In-Service Date, on estimated levels of production and, after the first year after the In-Service Date, based on actual operation of the System during the same period in the previous year, unless we mutually agree to an alternative methodology. (b) **If Vivint Solar Requests a Safety Shutdown**. In addition to our right to shut down the System for maintenance, we may shutdown the System if, in the exercise of reasonable judgment, we believe Site conditions or activities of persons on the Site, which are not under our control, whether or not under your control, may interfere with the safe operation of the System. We will give you notice of a shutdown immediately upon becoming aware of the potential for such conditions or activities. You will cooperate and coordinate with our respective efforts to restore Site conditions so as to not interfere with the safe operation of the System and to reduce, to the greatest extent practicable, the duration of the shutdown. In the event of such a shutdown, you will be deemed to have acted under Section 14(a) to shut down the System, and will pay us the amounts described in Section 14(a) with respect to the period of the shutdown, except that you will not be required to pay such amounts relating to any time period since it is our opinion that such operation shall be based on our notice or request of operation or notice of the shutdown. (c) **If You Close or Sell the Site**. If you close or sell the Site or it is permanently closed so that no amount of Energy is being produced by the System, you will pay us the Buy-Out Payment. (d) **Site Shutdowns; Interconnection Deactivated**. In the event that your Site is closed as a result of an event that is not (i) a Force Majeure Event or (ii) caused by or related to our unexcused action or inaction, you will continue to pay us for all the Energy produced by the System and delivered at the Point of Delivery. If the interconnection with the Electric Distribution Company becomes deactivated for reasons that are not (i) a Force Majeure Event or (ii) caused by or related to our unexcused action or inaction, such that the System is no longer able to produce electricity or transfer electricity to you or to the Electric Distribution Company, you will pay us an amount equal to the sum of (A) the payments you would have made to us for the Energy that would have been produced by the System following such shutdown; (B) the value to us of any benefits that we would have received with respect to the System under applicable incentive programs and any other assistance program with respect to the Energy that the System would have produced following such shutdown; and (C) the value to us of the Environmental Attributes and Tax and Financial Incentives that we would have received with respect to the Energy that the System would have produced following such shutdown. Determination of the amount of Energy that would have been produced following such closure shall be based on the formula set forth in Section 14(a)(iii). If a shutdown pursuant to this Section continues for one hundred and eighty (180) days or longer, we may terminate this Agreement and request you to pay the Buy-Out Payment.

**15. Force Majeure.** If Vivint Solar is unable to perform all or some of its obligations under this Agreement because of a Force Majeure Event, we will be excused from whatever performance is affected by the Force Majeure Event, provided that the suspension of our obligations is of no greater scope and of no longer duration than is required by the Force Majeure Event. "Force Majeure Event" means any event, condition or circumstance beyond the control of the affected party which, by the exercise of due foresight such party could not reasonably have been expected to avoid, and which by the exercise of due diligence such party without fault attributable to it is unable to overcome, including, but not limited to, action by a governmental authority, the failure to act on the part of any governmental authority or any interconnecting electrical utility (provided that such action has been timely requested and diligently pursued), failure to obtain or maintain a permit, license, consent or approval (provided that such party has made timely and reasonable commercial efforts to obtain and maintain the same), national or regional third party labor disputes, civil strike, work stoppage, slow-down, or lock-out, flood, earthquake, fire, lightning, wind, epidemic, war, terrorism, riot, economic sanction or embargo, civil disturbance, act of God, unavailability of electricity from the utility grid, equipment, supplies or products, power or voltage surge caused by someone other than asserting party including a grid supply voltage outside of the standard range specified by the applicable utility or failure of equipment not utilized by or under the control of the asserting party.

**16. Limitation of Liability.** You understand that: (A) we are not an insurer of your premises, property or personal safety of persons in your premises; (B) you are solely responsible for providing any and all insurance coverage for your premises and its contents; (C) the amount you pay us is based only on the value of the Energy we provide and not on the value of your premises or its contents; (D) the System may not protect against property for various reasons; (E) it is difficult to determine in advance the value of the property that might be lost, or damaged if the System or the System of the System fail to operate properly; (F) it is difficult to determine in advance whether, if any, of any property's loss, personal injury or death that would presumably caused by our failure to perform or from a failure of the System, or the System installation. **Therefore, you agree, even if a court decides that our breach of this Agreement, or failure of the System, or our negligence, or a failure of the System installation, or repair, caused or allowed any harm or damage (whether property damage, personal injury, or death) to you or anyone in your premises, you agree that our liability (other than our liability for willful injury, fraud, gross negligence or violation of the law) shall be limited to the amount you have paid for the Energy produced by the System during this shall be your sole and exclusive remedy against us regardless of what legal theory (including without limitation, negligence, breach of contract, breach of warranty or product liability) is used to determine that we were liable for the injury or loss.**

**17. Third Party Indemnification and Subrogation.** If anyone other than you asks us to pay for any harm or damages (including property damage, personal injury or death) connected with or resulting from (i) our breach of this agreement, (ii) a failure of the System, (iii) our negligence, (iv) any other improper or careless activity of ours in providing and installing the System (other than willful injury, fraud, gross negligence, and violation of the law), or (v) a claim for indemnification or contribution, you will pay us (A) any amount which a court orders us to pay or which we reasonably agree to pay; and (B) the amount of our reasonable attorney's fees and any other losses that we may pay in connection with the harm or damages. Your obligation to pay us for such harm or damages shall not apply if the harm or damages happens while one of our employees or subcontractors is on or about your premises, and such harm or damage is solely caused by that employee or subcontractor. Unless prohibited by law, you will receive payment from any party who makes a claim for any harm or damages suing through your authority or in your name, such as your insurance company, and agree to deal with such claims yourself. **YOU WILL NOTIFY YOUR INSURANCE COMPANY OF THIS RELEASE.**

**18. Limitation on Lawsuit; Jury Trial.** The laws of the state where your home is located shall govern this Agreement without giving effect to conflict of laws principles. To the extent permitted by law, both parties agree that no lawsuit or any other legal proceeding connected with this Agreement shall be brought or filed more than one (1) year after the incident giving rise to the claim occurred. **EACH PARTY WAIVES ANY RIGHT TO A JURY TRIAL. If the waiver of jury trial set forth in this Agreement is not enforceable, then any claim or cause of action arising out of or relating to this Agreement shall be settled by judicial reference pursuant to California Code of Civil Procedure §638 et. seq. before a referee sitting without a jury, such referee to be mutually acceptable to the parties or, if no agreement is reached, by a referee appointed by the Presiding Judge of the California Superior Court for Santa Clara County. You acknowledge that a judicial reference requires each party to pay a pro rata share of the referee's fees and costs.**

**19. Entire Agreement.** The entire and only agreement between us is written in this Agreement. It replaces any earlier oral or written understanding or agreements. It may only be changed by a written agreement signed by you and us. It may not be changed by any oral statements or representations made by our sales representative(s). If you have given or over given us an agreement for the System or service which provides for different terms other than this Agreement, this Agreement will govern such an overriding conflict or inconsistency. If the courts finds that any provision of this Agreement is unenforceable, or against public policy, or violates applicable law, the balance of the Agreement shall remain in force. You agree that all other documents executed by you that are stored electronically shall be given the same force and effect as the paper-form original.

**20. Licenses.** For questions regarding our California Contractors License, please contact the Contractors State License Board, 9821 Business Park Drive, Sacramento, CA 95827.

# EXHIBIT C

# EXHIBIT C

## REQUEST FOR EXCLUSION FROM SETTLEMENT

*Gerrie Dekker, v. Vivint Solar, Inc., et al.*
United States District Court, Northern District of California
Case No. 3:19-cv-07918-WHA

**YOU MAY TIMELY SUBMIT THIS REQUEST FOR EXCLUSION *ONLY* IF YOU *DO NOT* WISH TO BE INCLUDED IN THE SETTLEMENT AND IF YOU *DO NOT* WISH TO RECEIVE THE BENEFITS THE SETTLEMENT PROVIDES.**

**INSTRUCTIONS:**

You must timely complete, sign, and mail this Request for Exclusion if you want to "opt-out" of the Settlement and do not want to receive the modification of your PPA that is called for in the Settlement. If you choose to pursue a lawsuit, you will have to find new counsel at your own expense.

**IDENTIFYING INFORMATION**

Please verify and/or complete any missing identifying information:

NAME AND FORMER NAMES (IF ANY): _____
ADDRESS LINE 1                  _____
ADDRESS LINE 2                  _____
LAST FOUR DIGITS OF
SOCIAL SECURITY NUMBER          _____
TELEPHONE NUMBER                _____

If you want to be excluded from the Settlement and not receive the modification to your PPA called for in the Settlement, you must timely mail this Request for Exclusion to [INSERT SETTLEMENT ADMINISTRATOR INFORMATION] no later than [INSERT DATE].

I declare the foregoing to be true and correct under penalty of perjury under the laws of the United States and the State of California.

Date: _____, 2022

Signed: _____
[NAME]

Exhibit xxxxxx

# EXHIBIT D

# PHOENIX
## CLASS ACTION ADMINISTRATION SOLUTIONS

**CASE ASSUMPTIONS**

| | |
|---|---|
| Class Members | 1,000 |
| Opt Out Rate | 1% |
| Opt Outs Received | 10 |
| Total Class Claimants | 990 |
| Subtotal Admin Only | **$7,000.00** |

**Not-to-Exceed Total**     **$7,000.00**
**For 1000 Members**
**Pricing Good for Scope of Estimate Only**
**All Aspects of Escheating to the State of CA Included**

## September 7, 2022
## Case: Dekker v. Vivint Opt-Out Administration wLanguage

| | |
|---|---|
| **Phoenix Contact: Jodey Lawrence** | **Requesting Attorney: Joshua D. Boxer** |
| **Contact Number: 949.566.1455** | **Firm: Matern Law Group** |
| **Email: Jodey@phoenixclassaction.com** | **Contact Number: (310) 531-1846** |
| | **Email: jboxer@maternlawgroup.com** |

Assumptions and Estimate are based on information provided by counsel. If class size changes, PSA will need to adjust this Estimate accordingly. Estimate is based on **1000** Class Members. PSA assumes class data will be sent in Microsoft Excel or other usable format with no or reasonable additional formatting needed. A rate of $150 per hour will be charged for any additional analysis or programming.

### Case & Database Setup / Toll Free Setup & Call Center / NCOA (USPS)

| Administrative Tasks: | Rate | Hours/Units | Line Item Estimate |
|---|---|---|---|
| Programming Manager | $100.00 | 3 | $300.00 |
| Programming Database & Setup | $100.00 | 3 | $300.00 |
| Toll Free Setup* | $145.00 | 1 | $145.00 |
| Call Center & Long Distance | $2.00 | 16 | $32.00 |
| NCOA (USPS) | $275.00 | 1 | $275.00 |
| | | **Total** | **$1,052.00** |

* Up to 120 days after disbursement

### Data Merger & Scrub / Notice Packet, Opt-Out Form & Postage / Spanish Translation / Reporting

| Project Action | Rate | Hours/Units | Line Item Estimate |
|---|---|---|---|
| Notice Packet Formatting | $100.00 | 2 | $200.00 |
| Data Merge & Duplication Scrub | $0.25 | 1,000 | $250.00 |
| Notice Packet & Opt-Out Form | $1.00 | 1,000 | $1,000.00 |
| Estimated Postage (up to 2 oz.)* | $0.84 | 1,000 | $840.00 |
| Static Website | $200.00 | 1 | $200.00 |
| Language Translation | $825.00 | 1 | $825.00 |
| | | **Total** | **$3,315.00** |

* Prices good for 90 days. Subject to change with the USPS Rate or change in Notice pages or Translation, if any.



## Skip Tracing & Remailing Notice Packets / Tracking & Programming Undeliverables

| Project Action: | Rate | Hours/Units | Line Item Estimate |
|---|---|---|---|
| Case Associate | $55.00 | 2 | $110.00 |
| Skip Tracing Undeliverables | $2.00 | 200 | $400.00 |
| Remail Notice Packets | $1.00 | 200 | $200.00 |
| Estimated Postage | $0.84 | 200 | $168.00 |
| Programming Undeliverables | $50.00 | 2 | $100.00 |
| | | **Total** | **$978.00** |

## Database Programming / Processing Opt-Outs, Deficiencies or Disputes

| Project Action: | Rate | Hours/Units | Line Item Estimate |
|---|---|---|---|
| Non Opt-Out Processing | $125.00 | 1 | $125.00 |
| Case Associate | $55.00 | 2 | $110.00 |
| Opt-Outs/Deficiency/Dispute Letters | $10.00 | 3 | $30.00 |
| Case Manager | $85.00 | 2 | $170.00 |
| | | **Total** | **$435.00** |

## Calculation & Disbursement Programming/ Create & Manage QSF/ Mail Checks

| Project Action: | Rate | Hours/Units | Line Item Estimate |
|---|---|---|---|
| Programming Calculations | $100.00 | 2 | $200.00 |
| Programming Manager | $75.00 | 2 | $150.00 |
| | | **Total** | **$350.00** |

* Checks are printed on 8.5 x 11 in. sheets with W2/1099 Tax Filing



| Tax Reporting & Reconciliation / Re-Issuance of Checks / Conclusion Reports and Declarations | | | |
|---|---|---|---|
| **Project Action:** | **Rate** | **Hours/Units** | **Line Item Estimate** |
| Case Supervisor | $100.00 | 2 | $200.00 |
| Case Associate | $50.00 | 2 | $100.00 |
| Conclusion Reports | $100.00 | 2 | $200.00 |
| Case Manager Conclusion | $85.00 | 2 | $170.00 |
| Final Reporting & Declarations | $100.00 | 2 | $200.00 |
| | | **Total** | **$870.00** |

* All applicable California State & Federal taxes, which include SUI, ETT, and SDI, and FUTA filings. Additional taxes are Defendant's responsibilty.

**Estimate Total:** **$7,000.00**



## **TERMS AND CONDITIONS**

**Provisions:** The case estimate is in good faith and does not cover any applicable taxes and fees. The estimate does not make any provision for any services or class size not delineated in the request for proposal or stipulations. Proposal rates and amounts are subject to change upon further review, with Counsel/Client, of the Settlement Agreement. Only pre-approved changes will be charged when applicable. No modifications may be made to this estimate without the approval of PSA (Phoenix Settlement Administrators). All notifications are mailed in English language only unless otherwise specified. Additional costs will apply if translation into other language(s) is required. Rates to prepare and file taxes are for Federal and California State taxes only. Additional charges will apply if multiple state tax filing(s) is required. **Pricing is good for ninety (90) days.**

**Data Conversion and Mailing:** The proposal assumes that data provided will be in ready-to-use condition and that all data is provided in a single, comprehensive Excel spreadsheet. PSA cannot be liable for any errors or omissions arising due to additional work required for analyzing and processing the original database. A minimum of two (2) business days is required for processing prior to the anticipated mailing date with an additional two (2) business days for a National Change of Address (NCOA) update. Additional time may be required depending on the class size, necessary translation of the documents, or other factors. PSA will keep counsel apprised of the estimated mailing date.

**Claims:** PSA's general policy is to not accept claims via facsimile. However, in the event that facsimile filing of claims must be accepted, PSA will not be held responsible for any issues and/or errors arising out of said filing. Furthermore, PSA will require disclaimer language regarding facsimile transmissions. PSA will not be responsible for any acts or omissions caused by the USPS. PSA shall not make payments to any claimants without verified, valid Social Security Numbers. All responses and class member information are held in strict confidentiality. Additional class members are $10.00 per opt-out.

**Payment Terms**: All postage charges and 50% of the final administration charges are due at the commencement of the case and will be billed immediately upon receipt of the data and/or notice documents. PSA bills are due upon receipt unless otherwise negotiated and agreed to with PSA by Counsel/Client. In the event the settlement terms provide that PSA is to be paid out of the settlement fund, PSA will request that Counsel/Client endeavor to make alternate payment arrangements for PSA charges that are due at the onset of the case. The entire remaining balance is due and payable at the time the settlement account is funded by Defendant, or no later than the time of disbursement. Amounts not paid within thirty (30) days are subject to a service charge of 1.5% per month or the highest rate permitted by law.

### Tax Reporting Requirements

PSA will file the necessary tax returns under the EIN of the QSF, including federal and state returns. Payroll tax returns will be filed if necessary. Under the California Employment Development Department, all taxes are to be reported under the EIN of the QSF with the exception of the following taxes: Unemployment Insurance (UI) and Employment Training Tax (ETT), employer-side taxes, and State Disability Insurance (SDI), an employee-side tax. These are reported under Defendant's EIN. Therefore, to comply with the EDD payroll tax filing requirements we will need the following information:

1. Defendant's California State ID and Federal EIN.

2. Defendant's current State Unemployment Insurance (UI) rate and Employment Training Tax (ETT) rate. This information can be found in the current year DE 2088, Notice of Contribution Rates, issued by the EDD.

3. Termination dates of the class members, or identification of current employee class members, so we can account for the periods that the wages relate to for each class member.

4. An executed Power of Attorney (Form DE 48) from Defendant. This form is needed so that we may report the UI, SDI, and ETT taxes under Defendant's EIN on their behalf. If this form is not provided we will work with the EDD auditors to transfer the tax payments to Defendant's EIN.

5. Defendant is responsible for reporting the SDI portion of the settlement payments on the class member's W-2. PSA will file these forms on Defendant's behalf for an additional fee and will issue an additional W-2 for each class member under Defendant's EIN, as SDI is reported under Defendant's EIN rather than the EIN of the QSF. The Power of Attorney (Form DE 48) will be needed in order for PSA to report SDI payments.