1

2

3

4

5                        UNITED STATES DISTRICT COURT

6

7                       NORTHERN DISTRICT OF CALIFORNIA

8

9    GERRIE DEKKER, individually and on
     behalf of all others similarly situated,
10                                                    No.  C 19-07918 WHA
                      Plaintiff,
11
               v.
12
     VIVINT SOLAR, INC., VIVINT SOLAR          **ORDER RE MOTIONS FOR FINAL**
13   HOLDINGS, INC., VIVINT SOLAR              **APPROVAL AND ATTORNEY'S**
     DEVELOPER, LLC, and VIVINT SOLAR          **FEES, COSTS, AND SERVICE**
14   PROVIDER, LLC,                            **AWARD**

15                    Defendants.

16   ─────────────────────────────

17

18                             **INTRODUCTION**

19          In this unfair business practices class action, plaintiff moves for final approval of a class

20   settlement.  Because the settlement is fair, reasonable, and adequate, final approval is

21   **GRANTED**.

22          Separately, plaintiff moves for an award of attorney's fees in the amount of $1,859,273,

23   costs in the amount of $168,276.05, and a class representative service award in the amount of

24   $15,000.  This order finds that attorney's fees should be reduced to $100,000, with the

25   possibility of more to be awarded later if additional benefit to the class materializes.  It further

26   finds that costs should be reduced to $25,427.60, and that the class representative service

27   award should be reduced to $500.  To the extent stated herein, the motion for attorney's fees,

28   costs, and a class representative service award is **GRANTED**.

United States District Court
Northern District of California

United States District Court
Northern District of California

This class action began broad and ended narrow in a no-cash settlement that formalized a practice both sides recognize defendants had already implemented.  While class counsel invested considerable time, most of that time led to no benefit to the class.  Any additional benefit to the class deriving from setting the existing practice in stone remains speculative at this juncture.  Accordingly, this order awards attorney's fees in two steps:  $100,000 now and a further amount in the future, if warranted, once we can better assess the full extent of the class benefit.

**STATEMENT**

Previous orders described the facts herein (Dkt. Nos. 121, 140, 230).  At all relevant times, defendant Vivint Solar, Inc., in its various corporate forms (collectively, "Vivint"), has installed solar panels on customers' roofs and, as advertised, has sold those customers low-cost, clean energy pursuant to power purchase agreement ("PPA") contracts.  In exchange for Vivint paying the upfront costs of building and operating their solar photovoltaic systems, customers have agreed to buy the electricity that their systems produce over a twenty-year term from Vivint at a set price.  Plaintiff Gerrie Dekker alleges that Vivint's "Version 1" PPA contracts, issued between 2012 and 2013, contain liquidated damages provisions that impose harsh, unlawful penalties on customers.  Ms. Dekker brought this action on behalf of a class of 947 customers who are parties to Version 1 PPA contracts.[1]

Originally, the action was much broader.  The initial complaint, filed in December 2019, named ten plaintiffs (Dkt. No. 1), but a March 2020 order compelled all but two of those plaintiffs to arbitration (Dkt. No. 47).  The exceptions were Ms. Dekker, whose Version 1 PPA contract did not include an arbitration clause, and Juan Bautista, a native Spanish speaker with

---

[1] Both sides refer to 951 class members (Fairness Br. 9 n.5; Fairness ISO Br. 1).  But there were 955 potential class members, four opt-outs, and four undeliverable class notices (Fairness Br. 8; Fairness ISO Br. 2).  Seeing that those potential class members who opt out *and* those whose class notices remain undeliverable shall be excluded from the class and not bound pursuant to the provisionally approved settlement agreement, there are actually 947 class members (*see* Dkt. No. 292-1 ¶ 4.5; *see also id*. ¶¶ 3.4, 4.2.2).  This error may derive from class counsel, yet again, including an outdated settlement agreement in the exhibits to their motion (Dkt. No. 294-2 at 23–41; *see* Dkt. No. 291 at 2).  The outdated settlement agreement did not reflect that those potential class members whose class notices remain undeliverable shall be excluded from the class and not bound, a change the judge had to expressly request twice (Dkt. Nos. 285, 289 at 3).

United States District Court
Northern District of California

1    almost no English proficiency who had ostensibly not agreed to arbitrate when he signed his

2    contract.  Vivint promptly appealed the March 2020 order, plaintiffs amended their complaint,

3    and the action continued apace (Dkt. Nos. 48, 65).

4          Then, in May 2020, Vivint dropped the ball on meeting its JAMS filing fee deadlines, a

5    material breach of the arbitration agreements under then-recently enacted California Code of

6    Civil Procedure Section 1281.97.  Accordingly, an August 2020 order vacated the March 2020

7    order as far as it compelled select plaintiffs to arbitrate, inviting those plaintiffs back into this

8    forum (Dkt. No. 84).  Vivint promptly appealed the August 2020 order as well (Dkt. No. 86).

9    Two months later, Sunrun, Inc. acquired Vivint (Dkt. No. 296-11 ¶ 1).

10         In January 2021, our court of appeals dismissed Vivint's first appeal for lack of

11    jurisdiction, "remand[ing] to the district court for it to determine if Plaintiffs should be granted

12    leave to amend the complaint" (Dkt. No. 111).  Leave to amend was ultimately granted,

13    formalizing plaintiffs' reliance on Class Action Fairness Act ("CAFA") jurisdiction (Dkt.

14    No. 121).  In April 2021, Vivint moved for judgment on the pleadings, which was granted with

15    respect to plaintiffs' claim under California's Unfair Competition Law ("UCL") to the extent

16    that it alleged unfairness based on violations of the Translation Act suffered by Mr. Bautista

17    (Dkt. No. 140).  Plaintiffs were subsequently permitted to amend their complaint once more to

18    include a damages claim under California's Consumers Legal Remedies Act ("CLRA"), but

19    they were denied leave to include a revised UCL claim alleging unfairness based on violations

20    of the Translation Act, as well as a new restitution claim under the CLRA and UCL (Dkt.

21    No. 157).

22         In October 2021, the other shoe dropped when our court of appeals ruled on Vivint's

23    second appeal, holding that whether Vivint's failure to pay the JAMS filing fees qualified as a

24    breach of the arbitration agreements fell within the scope of the delegation clauses of the post-

25    2013, non-Version 1 PPA contracts (Dkt. No. 177).  The order compelling plaintiffs who were

26    parties to those contracts to arbitration was hence reinstated (Dkt. No. 178).  Some of those

27    plaintiffs opted to settle with Vivint, as did Mr. Bautista (Dkt. No. 185).  By November 2021,

28    Ms. Dekker was our only named plaintiff (*ibid*.; *see* Dkt. No. 214).

United States District Court
Northern District of California

1    A class was certified in March 2022 under Rule 23(b)(2) of the Federal Rules of Civil

2    Procedure to include "[a]ll persons in California currently in privity of contract with Vivint

3    Solar because they are subject to Version 1 of the Residential Solar Power Purchase

4    Agreement" (Dkt. No. 230).  Despite the fact that damages were previously sought (Dkt.

5    No. 209), plaintiff only sought injunctive and declaratory relief by the class certification stage

6    (Dkt. No. 214).  An order regarding partial summary judgment, issued concurrently with the

7    order regarding class certification, held that plaintiff's claims were not moot, plaintiff did not

8    have an adequate remedy at law, and any order enjoining the enforcement of the alleged

9    liquidated damages provisions would grant private injunctive relief on behalf of individuals

10   with Version 1 PPA contracts, not public injunctive relief on behalf of the general public (Dkt.

11   No. 229).  This was in recognition of the fact that, as of December 31, 2021, Vivint no longer

12   engaged in sales activities beyond those with customers who had previously initiated

13   negotiations (*id*. at 10).

14       The parties attended settlement conferences and, in July 2022, reached an initial

15   settlement agreement (Dkt. No. 274).  The trial date was vacated, and plaintiff moved for

16   preliminary approval in September 2022 (Dkt. Nos. 278, 282).  At the hearing on preliminary

17   approval, the judge identified several deficiencies in the proposed settlement agreement and

18   class notice, and ordered the submission of revisions (Dkt. No. 285).  The submitted revisions

19   were lacking, and the judge ultimately had to issue two further orders directing counsel to

20   make corrections (Dkt. Nos. 289, 291).  Preliminary approval was finally granted in January

21   2023 (Dkt. No. 293).

22       Plaintiff now moves for final approval of the class settlement and, separately, for

23   attorney's fees, costs, and a class representative service award (Dkt. Nos. 294–95).  This order

24   follows full briefing and oral argument.

25                                    **ANALYSIS**

26   **1.    MOTION FOR FINAL APPROVAL.**

27       "The class action device, while capable of the fair and efficient adjudication of a large

28   number of claims, is also susceptible to abuse and carries with it certain inherent structural

4

1    risks." *Officers for Just. v. Civ. Serv. Comm'n of S.F.*, 688 F.2d 615, 623 (9th Cir. 1982).  As

2    set out in Rule 23(e)(2) of the Federal Rules of Civil Procedure, a district court may grant

3    approval of a settlement that would bind class members only after a hearing and only upon a

4    finding that it is fair, reasonable, and adequate.

5          Our court of appeals has explained that any such finding under Rule 23(e)(2) is guided by

6    the eight *Churchill* factors:  (1) the strength of the plaintiff's case; (2) the risk, expense,

7    complexity, and likely duration of further litigation; (3) the risk of maintaining class action

8    status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

9    completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the

10   presence of a governmental participant; and (8) the reaction of the class members of the

11   proposed settlement.  *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (quoting *In re*

12   *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)).

13         Meanwhile, Rule 23(e)(2) itself, as amended in 2018, requires a district court to take up

14   an additional set of factors.  Fed. R. Civ. P. 23(e)(2)(A)–(D).  To find that a settlement is fair,

15   reasonable, and adequate, a district court must assess whether:  (A) the class representatives

16   and class counsel have adequately represented the class; (B) the proposal was negotiated at

17   arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class

18   members equitably relative to each other.  Other relevant factors that will be considered are

19   those listed in the judge's notice regarding factors to be evaluated for any proposed class

20   settlement, filed herein December 2019 (Dkt. No. 12).

21         In short, in consideration for the dismissal of this action with prejudice and a release of

22   claims related to the alleged liquidated damages provisions, Vivint agrees to modify the

23   Version 1 PPA contracts of class members to reduce the price paid by those who default and

24   buy out their systems from seven dollars per watt to four dollars per watt, with a five percent

25   reduction for each year their systems were in service (Dkt. No. 292-1 ¶ 7.1).  This order finds

26   the settlement fit for final approval.

27              *A.    THE CHURCHILL FACTORS.*

28         We begin with the eight *Churchill* factors, which collectively support settlement.

United States District Court
Northern District of California

5

*First*, this was never a powerful case to begin with.  The action was originally brought in 2019 by ten plaintiffs seeking certification of a class estimated to be in the tens of thousands and asserting a range of interrelated state law claims (Dkt. No. 1).  We are now left with one plaintiff on behalf of a class of 947 customers seeking to settle some of those claims.  At trial, plaintiff would have had the burden of establishing that the alleged liquidated damages provisions were not setting out alternatives to performance and instead prevented customers from making realistic and rational choices (*see* Dkt. No. 230 at 8–10).  And, defendants could have escaped liability by demonstrating that actual damages would have been difficult to quantify and seven dollars per watt was a reasonable estimate (*see id.* at 7–8).  Even recognizing plaintiff's (limited) success at the partial summary judgment stage with respect to this (limited) class, she certainly would have risked losing when proceeding on such questions.  This factor weighs moderately in favor of settlement.

*Second*, the risk, expense, complexity, and likely duration of further litigation likewise support settlement.  Here, the risk of loss identified above applies equally to both sides, as both sides acknowledge (Fairness Br. 11; Fairness ISO Br. 8).  The action has already resulted in two appeals, and proceeding to trial would likely result in more and drag this on.  Meanwhile, trial and additional appeals would require racking up additional fees beyond the disproportionate fees already incurred.

*Third*, the risk of maintaining class action status throughout trial is neutral.  The class was certified in March 2022 (Dkt. No. 230).  Although it is unlikely that the class would be decertified, defendants could have offered evidence that the value of the systems installed at class member homes varies so significantly that ascertaining damages would present individualized questions of fact, precluding class-wide resolution (*see* Dkt. No. 296-1 ¶ 12).

*Fourth*, the "amount" offered in settlement supports settlement.  Although this settlement provides for the modification of a contract instead of a cash award, the parties agree that the potential savings amount for defaulting customers is similar to that which plaintiff could have achieved had she prevailed at trial (Dkt. Nos. 294-1 ¶ 16, 296-1 ¶ 11).  And, as plaintiff acknowledges, even if the default provisions had been invalidated, class members still would

have been left vulnerable seeing that defendants could have pursued common law remedies to offset the savings provided (Fairness Br. 11).

*Fifth*, the extent of discovery completed and the stage of proceedings support settlement. The narrowed claims have survived dismissal, judgment on the pleadings, partial summary judgment, and class certification (Dkt. Nos. 47, 140, 229, 230).  Plaintiff (then plaintiffs) served 25 interrogatories, five sets of requests for production, and two expert reports (Fairness ISO Br. 7).  Defendants produced over 16,000 pages of documents and one expert report (Fairness Br. 4–5).  There has been ample discovery, and the settlement was reached just two months before the action would have proceeded to trial (*see* Dkt. No. 278).

*Sixth*, the experience and views of counsel support settlement.  Although it was not always readily apparent, counsel for both sides are sufficiently experienced in complex litigation and class actions.  As class counsel observe, with the settlement, class members stand to save, whereas without it, they could be trapped in unfavorable contracts for years to come (Fairness Br. 11).  Likewise, defense counsel acknowledge the benefits of settlement for class members, emphasizing the avoidance of damages for breach (Fairness ISO Br. 9).

*Seventh*, although there was not a governmental participant in this action, defendants notified the California Attorney General and the United States Attorney General, as required by CAFA, in September 2022 (Dkt. Nos. 283, 284).  Neither has raised any concerns involving the settlement.

*Eighth*, the reaction of the class members of the proposed settlement favors settlement. Of the 955 potential class members notified, only four requested exclusion, and more than 99% of the potential class members are participating (Dkt. No. 294-5 ¶¶ 7–8).

In sum, the *Churchill* factors support final approval of the settlement.

### B.   THE RULE 23(e)(2) FACTORS.

"[C]onsideration of these eight *Churchill* factors alone is not enough . . . . "  *Kim*, 8 F.4th at 1179 (quoting *Bluetooth*, 654 F.3d at 946).  Rule 23(e)(2), as amended in 2018, requires the district court to go beyond Ninth Circuit precedent by analyzing the four additional factors set out previously.  *See Briseño v. Henderson*, 998 F.3d 1014, 1026 (9th Cir. 2021).  To reiterate,

United States District Court
Northern District of California

1    in order to find that a settlement is fair, reasonable, and adequate, a district court must consider

2    whether:  (A) the class representatives and class counsel have adequately represented the class;

3    (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is

4    adequate; and (D) the proposal treats class members equitably relative to each other.  This

5    order evaluates these factors to the extent not considered in the *Churchill* analysis above.

6         *First*, class counsel and the class representative have, by and large, represented the class

7    adequately.  As noted before, the relief is similar to what could have been achieved had

8    plaintiff been successful at trial.  To the extent that class counsel and the class representative

9    could have done better, that should (and will) be reflected in their compensation, not in the

10   denial of a settlement that has some benefit to the class.

11        *Second*, the proposal was negotiated at arm's length.  Chief Magistrate Judge Donna Ryu

12   supervised settlement negotiations in the lead-up to trial, and the parties did not immediately

13   agree on settlement terms.  There is no discussion of attorney's fees in the settlement

14   agreement beyond plaintiff's right to seek them and defendants' right to oppose them — and

15   no discussion of plaintiff's entitlement to fees in the first place (Dkt. No. 292-1 ¶¶ 6.2, 6.2.1,

16   8.4).  What's more, there is no evidence of collusion and, to the contrary, there is a stark

17   $1,786,773 difference between the attorney's fees class counsel and defense counsel believe

18   should be awarded.  That is not to mention the $142,848.45 difference in opinion on costs and

19   the $13,000 difference in opinion on the class representative service award.  In total, class

20   counsel has requested $1,942,621.45 more than what defense counsel believe is warranted.

21   For all of these reasons, this order concludes that the settlement agreement was the result of

22   arm's-length negotiations.[2]

23        *Third*, the relief is adequate, taking into account, as required:  (i) the costs, risks, and

24   delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to

25   the class, including the method of processing class-member claims; (iii) the terms of any

26

27   ───────────────

28   [2] This order also finds that the settlement agreement shows none of the warning signs of collusion set out in the so-called *Bluetooth* factors because, once more, the settlement agreement does not provide for attorney's fees.  *See Briseño*, 998 F.3d at 1023 (quoting *Bluetooth*, 654 F.3d at 947).

United States District Court
Northern District of California

proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). Again, the relief is similar to what could have been achieved at trial, and there was risk in pursuing further litigation. The relief is also adequate considering the method of distributing it to the class: a strong effort was (eventually) made to notify all potential class members of the settlement, and their Version 1 PPA contracts will be automatically changed pursuant to the settlement agreement. Note that after defendants provided a list of potential class members, the settlement administrator conducted a National Change of Address search. Class notices were mailed to 955 potential class members and emailed to 947 of those potential class members. The settlement administrator conducted skip-traces for 38 undelivered class notices as requested by the judge and, in the end, there were only four that remained undeliverable (Dkt. No. 294-5; *see* Dkt. No. 285). This systematic effort to notify potential class members and the automatic change to class member contracts make the distribution of relief very effective. Recall, there was no provision for attorney's fees beyond plaintiff's right to seek them and defendants' right to oppose them. And, there was no agreement identified under Rule 23(e)(3).

*Fourth*, the settlement treats class members equitably relative to each other. It modifies the contracts on a per watt basis with a standard annual discount such that class members are treated the same no matter the size of their system.

In sum, the Rule 23(e)(2) factors likewise support final approval of the settlement.

## C.     THIS COURT'S FACTORS.

A prior order laid out fourteen factors that would be analyzed in the event of a proposed class settlement (Dkt. No. 12). This order evaluates these factors to the extent relevant to the settlement at issue and not considered in the *Churchill* and Rule 23(e)(2) analyses above.

The fourth factor contemplates whether the release is limited only to the certified claims (*id.* at 3). The judge had to instruct counsel twice to modify the release in the settlement agreement and class notice such that it was clear that class members would only be releasing claims that were asserted and settled in this action (Dkt. No. 289 at 2–3). The settlement

United States District Court
Northern District of California

1    agreement and class notice now reflect the narrow release of claims (Dkt. Nos. 292-1 ¶ 7.1,

2    292-2 at 2).

3        The eighth factor makes clear that an opt-out option is not a cure-all for a poor-quality

4    settlement (Dkt. No. 12 at 4).  Although this settlement has an opt-out option and four potential

5    class members chose to exercise it, that option is not operating as a pernicious cure-all here.

6    As explained in the analysis of *Churchill* factor eight and Rule 23(e)(2) factor three, the

7    settlement does not rely heavily on the opt-out option, and it provides value for the vast

8    majority of potential class members.

9        The ninth factor acknowledges the danger of giving incentive payments to named

10    plaintiffs to sweeten an inadequate deal (*ibid.*).  Although class counsel now separately seek a

11    class representative service award for Ms. Dekker, this has no bearing on the settlement itself.

12    Defendants did not offer plaintiff an incentive payment to settle the case.

13        In sum, the factors laid out in the prior order further support final approval.  As such, for

14    the foregoing reasons, final approval of the class settlement is hereby **GRANTED**.

15        **2.    MOTION FOR ATTORNEY'S FEES, COSTS, AND SERVICE AWARD.**

16        As mentioned above, the settlement agreement did not discuss attorney's fees beyond

17    plaintiff's right to seek them and defendants' right to oppose them.  Plaintiff now separately

18    moves for $1,859,273 in fees, $168,276.05 in costs, and $15,000 for a class representative

19    service award under Rule 23(h) of the Federal Rules of Civil Procedure.  Defendants counter

20    that plaintiff should receive no more than $72,500 in fees, $25,427.60 in costs, and $2,000 for

21    a class representative service award.  This order turns to resolving the chasmic dissonance.

22        ***A.    ATTORNEY'S FEES.***

23        Let's start with the requested fees, and before that, some context.  As the parties are

24    aware, mere months ago, our court of appeals decisively reversed and remanded a 1.7-million-

25    dollar fee award.  *See Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985 (9th Cir. 2023).[3]  That

26

27    ───────────────

      [3] Meanwhile, three weeks ago, our court of appeals denied a petition to rehear *Lowery en banc* and

28    issued an amended opinion that altered a single footnote.  The altered footnote does not affect this
      order's analysis.  *See Lowery v. Rhapsody Int'l, Inc.*, 69 F.4th 994 (9th Cir. 2023), *amended and
      superseded by* 75 F.4th 985 (9th Cir. Aug. 2, 2023).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   award was significantly less than the six million dollars requested by class counsel but still

2   *more than thirty times* the amount that the class had received from the underlying settlement.

3   *Id.* at 991.  In reversing the award, our court of appeals underscored that "[t]he touchstone for

4   determining the reasonableness of attorneys' fees in a class action is the benefit to the class."

5   *Id*. at 988.  Accordingly, "[i]t matters little that the plaintiffs' counsel may have poured their

6   blood, sweat, and tears into a case if they end up merely spinning wheels on behalf of the

7   class," as "[w]hat matters most is the result for the class members."  *Ibid*.  In *Lowery*, "the

8   benefit from th[e] litigation was minimal:  the class received a measly $52,841.05 and obtained

9   no meaningful injunctive or nonmonetary relief."  *Ibid*.

10      In our case, the settlement provides no cash to the class.  Rather, it provides a

11  modification to Version 1 PPA contracts.  Specifically, the Version 1 PPA contracts of

12  947 class members will be modified to allow those who default and buy out their systems to

13  purchase them for four dollars per watt, discounted by five percent for each year the systems

14  have been in service, instead of seven dollars per watt, as set out in the original Version 1 PPA

15  contracts (Dkt. No. 292-1 ¶ 7.1).  And, it is undisputed that this merely formalizes Vivint's

16  existing practice:  the record reflects that, in rare cases of default, Vivint has routinely allowed

17  customers to buy out their systems for four dollars per watt, discounted by five percent for

18  each year the systems have been in service, instead of seven dollars per watt, as set out in the

19  original Version 1 PPA contracts (Fees Opp. 4; Fees Reply Br. 11; *see* Dkt. Nos. 296-11 ¶ 6,

20  296-12).[4]  Which is to say, class counsel seek *almost two million dollars* in fees for changing

21  the default provisions in the contracts of *less than one thousand customers* to conform to *what

22  Vivint was already doing* and, for all the record shows, would have continued to do.

23      As both sides recognize, this no-cash settlement does bind Vivint and its new parent

24  company Sunrun to continue this practice for all class members for the duration of their

25  contracts.  Based on the historical default rate of 0.5% for customers with Version 1 PPA

26

27  [4] The original Version 1 PPA contracts had already allowed customers who sold their homes to
    people unwilling or unable to assume the obligations under their contracts to buy out their systems
28  for four dollars per watt, and subsequent PPA contracts included an annual five percent discount
    that Vivint had opted to give to all customers (Dkt. No. 296-11 ¶ 6).

contracts, and the fact that all class members' systems are at least ten years old, roughly five class members stand to invoke this modification each year over the course of the next ten years, which amounts to roughly fifty class members in total (*see* Fees Opp. 5; Fees Reply Br. 7). This no-cash settlement also ensures all class members will know *at the outset* that they can buy out their systems at the reduced price and that the reduced price will be offered to individuals who assume their contractual obligations (*see* Dkt. No. 292-1 ¶ 9.7). In light of this, questions remain as to whether some additional benefit to the class may emerge. Rather than guess at that now, the practical approach is to wait and see, and then adjust attorney's fees upward to conform to how it actually plays out. If the settlement causes more class members to invoke the relevant provisions than has historically been the case, class counsel will be allowed to seek additional fees, explained below.[5]

But even so, this was by no means the blockbuster resolution that class counsel previously pursued and that could potentially justify their extraordinary fee request. Remember, they had once sought public injunctive relief and, briefly, damages on behalf of tens of thousands of Vivint customers. Indeed, much of the effort that went into litigating this case was dedicated to the arbitration fights of non-class members, several of whom ultimately settled out — for which class counsel were ostensibly compensated. In other words, as in *Lowery*, "the benefit from this litigation was minimal" and "the class . . . obtained no meaningful injunctive or nonmonetary relief." 75 F.4th at 988; *see also Stanikzy v. Progressive Direct Ins. Co.*, No. 22-35524, 2023 WL 4837875, at *2 (9th Cir. July 28, 2023) (upholding a reduced fee award last month based on a district court's finding that the requested fees would greatly exceed class recovery); *Create-A-Card, Inc. v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at *3 (N.D. Cal. Sept. 22, 2009) ("The determinative factor,

---

[5] To contextualize the historical default rate, defendants observe, and plaintiff does not contest, that the price of electricity under solar PPA contracts is typically lower than that charged by utilities (Fees Opp. 4). According to defendants, "[h]omeowners need electricity, and as long as their solar photovoltaic system provides it for less than the utility would, they have no reason to default on the PPA and face higher bills" (*ibid.*).

1    however, is the benefit to the class — here pretty small, far less than the fee request itself.  The

2    benefit to the class simply does not warrant the requested fee award.").

3        Class counsel emphasized at the hearing that *Lowery* was a copyright case and federal

4    law was at issue, whereas this is not a copyright case and state law is at issue (Tr. 8:21–9:1).

5    But *Lowery* was clear that "[t]he district court's fee award [was] not reasonable *under*

6    *Rule 23*."  75 F.4th at 991 (emphasis added).  Moreover, our court of appeals has held that

7    irrespective of whether a plaintiff was a prevailing party under a state law fee-shifting

8    provision, "the district court needed to do more to assure itself — and us — that the amount

9    awarded was not unreasonably excessive in light of the results achieved."  *Bluetooth*, 654 F.3d

10   at 943.  In other words, *Lowery* is on point and looms large here.  As set out below, this order

11   finds that a reduced fee award is appropriate.

12                              *       *       *

13       In a certified class action, a district court may award reasonable attorney's fees that are

14   authorized by law or by the parties' agreement.  Fed. R. Civ. P. 23(h).  As the settlement

15   agreement reached by the parties did not itself authorize an award, let alone speak to class

16   counsel's entitlement to an award, our first question is whether an award is authorized by law

17   (*see* Dkt. No. 292-1 ¶¶ 6.2, 6.2.1, 8.4).

18       In the end, plaintiff asserted an unlawful liquidated damages claim under Section 1671 of

19   the California Civil Code, as well as derivative claims under the CLRA and UCL (Dkt.

20   No. 214).  Plaintiff alleged that defendants' inclusion of unlawful liquidated damages

21   provisions violated CLRA Section 1770(a)(14), which prohibits representing that a transaction

22   involves obligations prohibited by law, as well as Section 1770(a)(19), which prohibits

23   inserting an unconscionable provision into a contract.  According to class counsel, they are

24   thereby entitled to fees under the CLRA.

25       Under CLRA Section 1780(e), "[t]he court shall award court costs and attorney's fees to

26   a prevailing plaintiff in litigation" filed under Section 1770.  When litigation is resolved by a

27   pre-trial settlement, determination of the prevailing party under Section 1780 is within "the

28   sound exercise of [the trial court's] discretion."  *Kim v. Euromotors W./The Auto Gallery*

United States District Court
Northern District of California

13

(*Euromotors*), 56 Cal. Rptr. 3d 780, 788 (Cal. Ct. App. 2007).  California courts use two approaches to determine the prevailing party.  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. C 15-02672 CRB, 2023 WL 4109573, at *3 (N.D. Cal. June 20, 2023) (Judge Charles R. Breyer).  One looks at whether there is a net monetary recovery, as defined in California Code of Civil Procedure Section 1032.  *See Euromotors*, 56 Cal. Rptr. 3d at 786.  Another looks at whether the party succeeded on a practical level.  *See Graciano v. Robinson Ford Sales, Inc.*, 50 Cal. Rptr. 3d 273, 281–82 (Cal. Ct. App. 2006).  Succeeding on a practical level means "succeed[ing] on [a] significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit."  *Id.* at 284 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

Finding the more pragmatic approach more appropriate here, class counsel (narrowly) clear this bar.  Plaintiff ultimately sought private injunctive and declaratory relief to invalidate the default provisions in Version 1 PPA contracts.  Although there has been no finding that the default provisions were, in fact, liquidated damages provisions, the parties agree that the settlement's reduced four dollars per watt annually discounted price is fair and that it does not overcompensate defendants for customer default.  In other words, the default provisions can no longer be liquidated damages provisions.  In light of that, plaintiff has "succeeded on [a] significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit."  *Ibid.*  This order finds plaintiff is therefore a prevailing party under Section 1780, "mak[ing] such an award mandatory, not discretionary."  *Euromotors*, 56 Cal. Rptr. 3d at 788.

Separately, class counsel claim to be entitled to fees under Section 1021.5 of the California Code of Civil Procedure.  But being entitled to fees under Section 1021.5 requires, *inter alia*, that "a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons."  As discussed above, the benefit here was minimal and only conferred on 947 class members who signed Version 1 PPA contracts in 2012 and 2013.  And, only fifty class members, in all likelihood, stand to invoke the modified contract language, with the remainder receiving the peace of mind that they could.  Although

plaintiff has succeeded on a significant issue, she has not secured a significant benefit for the general public or a large class of persons, to say nothing of Section 1021.5's other requirements.  Thus, class counsel are entitled to fees under the CLRA but *not* under Section 1021.5.

"Whether an award is justified and what amount that award should be are two distinct questions, and the factors relating to each must not be intertwined or merged."  *Thayer v. Wells Fargo Bank, N.A.*, 112 Cal. Rptr. 2d 284, 298 (Cal. Ct. App. 2001) (citation omitted).  Defining a plaintiff as a prevailing party when she has succeeded in achieving some benefit sought on a significant issue is "a generous formulation that brings the plaintiff only across the statutory threshold," which "may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved."  *Hensley*, 461 U.S. at 433, 436.

Having established that class counsel are entitled to attorney's fees under the CLRA, we turn to the amount requested.  "Two primary methods of determining a reasonable attorney fee in class action litigation have emerged and been elaborated in recent decades."  *Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 676 (Cal. 2016); *see Lowery*, 75 F.4th at 990.  One is the percentage-of-recovery method, where the attorney's fees are calculated as a share of a common fund or the monetary value of class recovery.  The other is the lodestar method, where the attorney's fees are calculated by multiplying the number of reasonably spent hours by a reasonable hourly rate, and applying a positive or negative multiplier to "ratchet the attorneys' fees up or down" based on various factors.  *Lowery*, 75 F.4th at 990.

"Under either approach, '[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion.'"  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 260 (N.D. Cal. 2015) (Judge Jacqueline Scott Corley) (quoting *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002)).  "[T]he ultimate goal . . . is the award of a reasonable fee to compensate counsel for their efforts, irrespective of the method of calculation."  *Apple Comput., Inc. v. Superior Ct.*, 24 Cal. Rptr. 3d 818, 826 (Cal. Ct. App. 2005) (internal quotation and citation omitted).  After all, "[n]o rational person would spend, say, $1 million in

1    legal fees — and endure the hassles and headaches of litigation — to recover only relief that is

2    a small fraction of that amount." *Lowery*, 75 F.4th at 994.

3        In this action, class counsel request attorney's fees in the amount of $1,859,273 [*sic*]

4    based on a $929,636 lodestar and a multiplier of 2.0 (Fees Br. 8).[6]  They assert that California

5    substantive law governs the calculation of attorney's fees here and, thus, the use of the lodestar

6    method is mandatory (Fees Br. 13–14; Fees Reply Br. 9 (quoting *Serrano v. Priest*, 569 P.2d

7    1303, 1316 n.23 (1977))).  Defense counsel counter that our court of appeals has confirmed *Erie*

8    doctrine does not apply to a federal court's assessment of a class action settlement, including

9    attorney's fees, under Rule 23(e) (Fees Opp. 6 (quoting *Briseño*, 998 F.3d at 1029)).  This

10   seems like a rather generous read of *Briseño*, which concluded that "*Erie*'s effect on fee-

11   shifting law, if it even has one, is simply not implicated in this appeal." *Briseño*, 998 F.3d

12   at 1030.  In any event, we are now considering a motion for attorney's fees under Rule 23(h),

13   not a motion for approval of a settlement under Rule 23(e).[7]

14       State law governs plaintiff's right to fees and the method of calculating those fees.

15   *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995).  Although there is no

16   blanket "lodestar only" mandate in California, and every fee-shifting statute must be construed

17   on its own merits, the California Supreme Court has endorsed the lodestar method in fee-

18   shifting cases except in limited circumstances. *Laffitte*, 376 P.3d at 684 (quoting *Ketchum v.*

19   *Moses*, 17 P.3d 735, 744 (Cal. 2001)); *see ibid*. (collecting cases).  Of note, "[d]espite its

20

21   _____

22   [6] Following a meet and confer, class counsel agreed to eliminate three of more than ten categories of problematic billing identified in defendants' opposition (Dkt. No. 298-1 ¶ 5; *see* Fees Opp. 11–

23   13).  Despite correctly identifying the sum of those categories in their reply (Fees Reply Br. 6–7), class counsel were off by $0.50 in their accompanying declaration (Dkt. No. 298-1 ¶ 5), which led

24   to a discrepancy of $1.00 once their multiplier was applied (Fees Reply Br. 21).  In other words, class counsel's fee request should not be $1,859,273 but rather $1,859,272, two times the modified lodestar of $929,636.

25   [7] Since 2018, Rule 23(e) has required consideration of the terms of any proposed award of

26   attorney's fees in any proposed settlement to evaluate whether the relief provided for the class is adequate.  Fed. R. Civ. P. 23(e)(2)(C)(iii) & advisory committee's note to 2018 amendment.  In

27   evaluating the motion for final approval, this order considered such terms above.  Once again, there was no discussion of attorney's fees in the settlement agreement beyond plaintiff's right to

28   seek them and defendants' right to oppose them, and attorney's fees had no effect on the relief provided to the class.

United States District Court
Northern District of California

primacy, the lodestar method is not necessarily utilized in common fund cases." *Lealao v. Beneficial Cal., Inc.*, 97 Cal. Rptr. 2d 797, 803 (Cal. Ct. App. 2000); *see Laffitte*, 376 P.3d at 683–84.  But this is not a common fund case, where class counsel's efforts have created or preserved an identifiable fund of money out of which class members recover their award and class counsel recover their fees.  *See Serrano*, 569 P.2d at 1307–08; *Laffitte*, 376 P.3d at 683–84.  Nor is this a "constructive common fund" case, where defense counsel agree to pay class members and class counsel separately but the entire amount comes from the same source.  *See Laffitte*, 376 P.3d at 686–87; *Bluetooth*, 654 F.3d at 943.  In such circumstances, courts have used the lodestar method to calculate attorney's fees awarded under the CLRA, which can be cross-checked against the percentage-of-recovery method.  *See, e.g.*, *Graciano*, 50 Cal. Rptr. 3d at 285, 293; *Bluetooth*, 654 F.3d at 941, 945.[8]

As the California Supreme Court has recognized, cross-checking the lodestar against the value of the class recovery helps to determine a reasonable fee because it "provides a credible measure of the market value of the legal services provided."  *Laffitte*, 376 P.3d at 685 (quoting *Lealao*, 97 Cal. Rptr. 2d at 820).  As such, it is "consistent with the mandate of *Serrano*," which requires that the fee award be "'anchored' in the time spent by counsel on the case." *Lealao*, 97 Cal. Rptr. 2d at 816–17 (citing *Serrano*, 569 P.2d at 1316 n.23); *accord Laffitte*, 376 P.3d at 685 (citing *Lealao*, 97 Cal. Rptr. 2d at 816–17).  Our court of appeals also expressly encourages cross-checking to avoid unreasonable results and to ensure "that counsel's fee does not dwarf class recovery."  *Lowery*, 75 F.4th at 994 (quoting *Bluetooth*, 654 F.3d at 945).  Indeed, cross-checking is especially important in light of *Lowery* because, as even the California Supreme Court has acknowledged, "the lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the

---

[8] Defense counsel argue that *Laffitte* provides for the direct use of the percentage-of-recovery method, but they misstate its holding.  According to defense counsel, *Laffitte* held that a court may use the percentage-of-recovery method "when a class action settlement creates a monetary benefit for a class" (Fees Opp. 6), but it actually held that a court may use that method "when class action litigation *establishes a monetary fund* for the benefit of the class members . . . ."  376 P.3d at 686 (emphasis added).  Again, this class action litigation did not establish a monetary fund.

17

United States District Court
Northern District of California

1  results achieved." *Laffitte*, 376 P.3d at 687 (citation omitted); *cf. Lowery*, 75 F.4th at 988

2  ("What matters most is the result for the class members.").

3      Class counsel initially put forward a lodestar of $990,801.50 (Fees Br. 8).  Following a

4  meet and confer with defense counsel, they reduced the lodestar by $61,165.50 to $929,636

5  (Fees Reply Br. 6–7, 21).  According to class counsel's declaration, the time dedicated to tasks

6  exclusively associated with plaintiffs who received individual settlements was not included,

7  but much of the time spent seeking to include additional claims and plaintiffs was (Dkt.

8  No. 298-1 ¶ 12).  The thrust of defense counsel's remaining objections to class counsel's

9  requested fee award is that a great deal of the hours expended were on behalf of claims and

10  plaintiffs that did not prevail, such that the requested fee award cannot be justified by reliance

11  on class counsel's billing records.  That is true and will be taken up in due course.

12      But application of the lodestar method "begins with the 'lodestar,' *i.e.*, the number of

13  hours reasonably expended multiplied by the reasonable hourly rate." *Graciano*, 50 Cal. Rptr.

14  3d at 285.  It "is the basic fee" that later "may be adjusted by the court based on factors." *Ibid*.

15  Upon review of class counsel's billing records, declarations, and briefing, this order observes

16  that class counsel's reduced lodestar generally reflects reasonable hours expended at

17  reasonable rates.  Time was fairly devoted, and allegations of block billing and vague entries

18  are misplaced (*see* Fees Opp. 13).  The problem, however, is that class counsel have "achieved

19  only partial or limited success," such that "the product of hours reasonably expended on the

20  litigation as a whole times a reasonable hourly rate [is] an excessive amount." *Hensley*,

21  461 U.S. at 436.  "This will be true even where the plaintiff's claims were interrelated,

22  nonfrivolous, and raised in good faith." *Ibid*.

23      Conducting their own cross-check of sorts, class counsel suggest their lodestar is

24  reasonable given the potential savings of up to $8,990,750 in the "highly unlikely" scenario in

25  which all 951 [*sic*] class members buy out their systems in their ninth year of service (Fees

26  Br. 13).[9]  Applying class counsel's proposed 2.0 multiplier to the $929,636 lodestar, their

27

28  _____

[9] *See supra* note 1.

requested fees correspond to roughly 20% of $8,990,750.  Our court of appeals has recognized 25% of the recovery as the benchmark award for attorney's fees.  *Bluetooth*, 654 F.3d at 942; *see Laffitte*, 376 P.3d at 680.  But not only is the historical default rate for customers with Version 1 PPA contracts (and all Vivint customers) no more than 0.5% annually, but class counsel's estimate is impossible because all class members' systems are now at least ten years old (*see* Dkt. No. 296-11 ¶¶ 6, 8).[10]

For their part, defense counsel arrive at $289,006.33 in estimated class benefit (Fees Opp. 5).  *First*, they measure the average savings per class member in each of the next ten years — the difference between the four dollars and seven dollars per watt rates, discounted by five percent for each year a class member's system will have been in service, multiplied by the average system size of 5.184 kilowatts.  *Next*, defense counsel multiply the average savings per class member in each of those years by the number of anticipated defaults in each of those years.  Note they display the number of anticipated defaults as five class members per year, but they actually use 0.5% of the 951 [*sic*] class members minus the number of class members who ostensibly already defaulted, rounded up to the nearest hundredth, which amounts to between 4.5 and 5 class members per year.  *Finally*, defense counsel discount the total savings in each of those years to net present value.  Adding up the savings across the years, they propose that an appropriate fee would be a percentage-of-recovery award around $72,500, which corresponds to 25% of the approximate $290,000 class benefit (Fees Opp. 5; Dkt. No. 296-11 ¶ 10).  Although this order will make a minor adjustment to defense counsel's calculation to correct the number of class members, it finds that they have meaningfully captured the class benefit and the corresponding percentage-of-recovery award.

In line with the "significant trend" of "blending [] the two fee calculation methods, an approach in which one method is used to confirm or question the reasonableness of the other's

---

[10] While defense counsel state that *all systems* covered by Version 1 PPA contracts were at least ten years old as of the July fairness hearing (Fees Opp. 5), they previously represented that customers entered into Version 1 PPA contracts as late as September 2013 (Dkt. No. 189 at 9). The Vivint employee declaration that defense counsel cite clarifies that *all class members' systems* were at least ten years old as of the July fairness hearing (Dkt. No. 296-11 ¶ 8).

United States District Court
Northern District of California

result," this order uses the percentage-of-recovery method to cross-check the (un)reasonableness of the lodestar. *Laffitte*, 376 P.3d at 681. Where we should expect rough parity, here there is an extraordinary discrepancy. The $929,636 lodestar is about 12.8 times the $72,500 percentage-of-recovery award. And, it is that amount that is in line with a reasonable fee. *See Consumer Privacy Cases*, 96 Cal. Rptr. 3d 127, 137 n.13 (Cal. Ct. App. 2009) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery."); *Lowery*, 75 F.4th at 994 ("Except in extraordinary cases, a fee award should not exceed the value that the litigation provided to the class."). Like in *Lowery*, "no matter the final valuation of the settlement, the . . . lodestar amount will greatly exceed 25% of the value of the settlement. Indeed, it will be multiple times the settlement's value. And that is a major red flag that signifies that lawyers are being overcompensated and that they achieved only meager success for the class." 75 F.4th at 994.

Courts may increase or decrease the lodestar taking into account a variety of so-called reasonableness factors. Although the factors recognized by California and federal courts differ, both include the results obtained for the class. *See, e.g.*, *Laffitte*, 376 P.3d at 677; *Bluetooth*, 654 F.3d at 941–42; *see also Lealao*, 97 Cal. Rptr. 2d at 815–16. As observed in *Lealao*, "[a]n adjustment reflecting the amount of the class recovery is not significantly different from an adjustment reflecting a percentage of that amount; and California courts have evaluated a lodestar as a percentage of the benefit." *Lealao*, 97 Cal. Rptr. 2d at 818 (citing *Glendora Cmty. Redevelopment Agency v. Demeter*, 202 Cal. Rptr. 389 (Cal. Ct. App. 1984)). Meanwhile, in *Lowery*, our court of appeals expressly encouraged the district court to evaluate its lodestar as a percentage of the benefit on remand "and then award attorneys' fees proportional and reasonable to the benefit received by the class." 75 F.4th at 993–95. True, *Lowery* recognized that "assigning a precise dollar amount to the class benefit may prove difficult" where the relief is injunctive in nature and not easily monetized. *Id.* at 992 n.1. But here, like in *Lealao*, "[t]hough the settlement did not create a common fund out of which fees are to be paid, the monetary value of the benefit to the class is much less speculative than that of some

traditional common funds" on account of the historical default rate.  97 Cal. Rptr. 2d at 821.

This order will adjust the lodestar downward to reflect the results obtained for the class and the

benefit conferred by the settlement.  Seeing that additional benefit may materialize in the

future, however, this order will award attorney's fees in two steps if warranted.

For clarity, unlike defense counsel's chart, our chart accounts for 947 class members and

displays the anticipated defaults as 0.5% of 947 class members minus the number of class

members who ostensibly already defaulted, rounded up to the nearest hundredth, instead of as a

rounded five class members each year (in column F).  With this change, the estimated class

benefit is $287,668.01.

| A Years Since In-Service Date Under PPA v.1 | B Buyout Payment under Existing PPA ($7/W, discounted) | C Buyout Price under Existing PPA | D New Buyout Payment under Settlement ($4/W, discounted) | E New Buyout Price under Settlement | F Anticipated Defaults (0.5% per year) | G Nominal Savings Based on Settlement (average defaulting class member) | H Annual Expected Class Savings Given Default Rate | I Present Value of Projected Savings to Class |
|---|---|---|---|---|---|---|---|---|
| 8 | $ 4.64 | $ 24,053.76 | $ 2.65 | $ 13,737.60 | - | $ 10,316.16 | $ 0.00 | $ 0.00 |
| 9 | $ 4.41 | $ 22,861.44 | $ 2.52 | $ 13,063.68 | - | $ 9,797.76 | $ 0.00 | $ 0.00 |
| 10 | $ 4.19 | $ 21,720.96 | $ 2.39 | $ 12,389.76 | 4.74 | $ 9,331.20 | $ 44,229.89 | $ 44,229.89 |
| 11 | $ 3.98 | $ 20,632.32 | $ 2.28 | $ 11,819.52 | 4.72 | $ 8,812.80 | $ 41,596.42 | $ 39,615.64 |
| 12 | $ 3.78 | $ 19,595.52 | $ 2.16 | $ 11,197.44 | 4.69 | $ 8,398.08 | $ 39,387.00 | $ 35,725.17 |
| 13 | $ 3.59 | $ 18,610.56 | $ 2.05 | $ 10,627.20 | 4.67 | $ 7,983.36 | $ 37,282.29 | $ 32,205.84 |
| 14 | $ 3.41 | $ 17,677.44 | $ 1.95 | $ 10,108.80 | 4.65 | $ 7,568.64 | $ 35,194.18 | $ 28,954.34 |
| 15 | $ 3.24 | $ 16,796.16 | $ 1.85 | $ 9,590.40 | 4.62 | $ 7,205.76 | $ 33,290.61 | $ 26,084.06 |
| 16 | $ 3.08 | $ 15,966.72 | $ 1.76 | $ 9,123.84 | 4.60 | $ 6,842.88 | $ 31,477.25 | $ 23,488.81 |
| 17 | $ 2.93 | $ 15,189.12 | $ 1.67 | $ 8,657.28 | 4.58 | $ 6,531.84 | $ 29,915.83 | $ 21,260.62 |
| 18 | $ 2.78 | $ 14,411.52 | $ 1.59 | $ 8,242.56 | 4.55 | $ 6,168.96 | $ 28,068.77 | $ 18,998.05 |
| 19 | $ 2.64 | $ 13,685.76 | $ 1.51 | $ 7,827.84 | 4.53 | $ 5,857.92 | $ 26,536.38 | $ 17,105.59 |
| | | | | | | | | $ 287,668.01 |

Using the updated class benefit estimate, 25% of the value of the benefit obtained for the class

is $71,917.  Accounting for another reasonableness factor, the novelty of the issues, this order

will soften the blow and award class counsel $100,000 in fees at this time.  *See Laffitte*,

376 P.3d at 677; *Bluetooth*, 654 F.3d at 941–42.

"[W]here the plaintiff has achieved 'only limited success,' counting *all* hours expended

on the litigation — even those reasonably spent — may produce an 'excessive amount,' and

the Supreme Court has instructed district courts to instead 'award only that amount of fees that

is reasonable in relation to the results obtained.'"  *Bluetooth*, 654 F.3d at 942 (quoting *Hensley*,

461 U.S. at 436, 440).  California courts have embraced this instruction as well.  *See Mann v.*

*Quality Old Time Serv., Inc.*, 42 Cal. Rptr. 3d 607, 617–18 (Cal. Ct. App. 2006) (quoting

*Hensley*, 461 U.S. at 436, 440).  Having cross-checked the lodestar, this order finds that a

reduction to $100,000 will award that amount of fees that is reasonable in relation to the results

obtained.  Here too, "[t]he record reveals nothing about this case which would make it

manifestly inappropriate to evaluate the lodestar as a percentage of the recovery and adjust it

accordingly."  *Lealao*, 97 Cal. Rptr. 2d at 821; *see also id.* at 800 (holding that the trial court

had discretion "to measure an award calculated under the lodestar methodology by a

percentage-of-the-benefit yardstick and to adjust the lodestar upward or downward on that

basis").

 Recognizing, however, that it is unclear how many (if any) additional class members can

be expected to default and buy out their systems now that they are aware of the availability of a

reduced price at the outset — and that "we simply will not know for the next several years"

(Fees Reply Br. 13) — this order will allow class counsel to seek additional fees based upon

realized benefit to the class in three years' time.  *Cf. In re Pinterest Derivative Litig.*, No. C 20-

08331 WHA, 2022 WL 2079712, at *1–2 (N.D. Cal. 2022).  If more than the anticipated

fifteen class members invoke the modified Version 1 PPA contract language (which

corresponds to five class members each year for three years) class counsel may move for

attorney's fees once more.  Defense counsel shall keep records of how many class members

default and buy out their systems after the issuance of this order.  They shall also keep records

of how many individuals who have assumed the obligations under class members' contracts

default and buy out their systems after the issuance of this order, in case this could paint a

fuller picture.  Class counsel may, at reasonable intervals, request these records.  Possibly, the

records from the three-year period will allow us to extrapolate the full extent of the class

benefit over the ten-year period.

 In closing, this order would be remiss not to point out that another factor, the quality of

representation, supports the downward adjustment.  *See Laffitte*, 376 P.3d at 677; *Bluetooth*,

654 F.3d at 941–42.  It took one hearing and two subsequent orders for class counsel to make

the required changes to the settlement agreement and class notice (Dkt. Nos. 285, 289, 291).

This included correcting sloppy errors that were introduced while making changes (Dkt.

Nos. 289, 291).[11]  And, class counsel twice included outdated versions of the settlement agreement in exhibits to motions seeking approval — including their motion for final approval (*see* Dkt. Nos. 290-1 at 23–41, 294-2 at 23–41).  In both instances, the judge had to be the one to identify and inform class counsel of this mistake.  Furthermore, class counsel's representation was at times inadequate during the litigation itself, such as when they forgot to respond to defendants' first set of requests for admission and had to subsequently move for relief (Dkt. No. 275).  Extra efforts were necessary to protect the class here.

All told, the request for $1,859,273 in attorney's fees is **DENIED**.  An adjusted amount of $100,000 is **APPROVED** and will be awarded and paid now as attorney's fees.  Class counsel may move for additional attorney's fees, if warranted, in three years.

### B. COSTS.

Next, we turn to costs.  Class counsel request a total of $168,276.05 for costs, including $110,361 for costs associated with expert witness Bruce McFarlane, $30,294 for costs associated with expert witness Nora Ostrofe, $25,427.60 for miscellaneous litigation costs, and $2,193.45 for the cost of issuing an additional class notice upon the filing of this order (Dkt. No. 295-4).

The CLRA provides that a court must award "costs and attorney's fees to a prevailing plaintiff in litigation filed pursuant to [Section 1770]."  Cal. Civ. Code § 1780(e).  Nontaxable costs recoverable under the CLRA are governed by California Code of Civil Procedure Section 1033.5.  *Shuman v. SquareTrade Inc.*, No. C 20-02725 JCS, 2023 WL 2311950, at *8 (N.D. Cal. Mar. 1, 2023) (Judge Joseph C. Spero).  "It is well-established that a CLRA plaintiff is not entitled to recover expert-related costs unless the expert was ordered by the court."  *Volkswagen*, 2023 WL 4109573, at *13 (citing Cal. Civ. Proc. § 1033.5(b)).  Here, the experts were not ordered by the court, so the requests for $110,361 and $30,294 for costs related to Mr.

---

[11] Even in their motion for attorney's fees, class counsel — with dollar signs in their eyes — still misspell the names of at least four cases and one reporter (*see* Fees Br. 16, 23).

United States District Court
Northern District of California

1  McFarlane and Ms. Ostrofe, respectively, are **DENIED**.[12]  The request for $25,427.60 in

2  miscellaneous litigation costs is unopposed and **APPROVED** (Fees Opp. 18), but the request for

3  $2,193.45 for the cost of issuing an additional class notice is **DENIED**, recognizing that it goes

4  beyond the $8,000 cap that the parties had expressly agreed the settlement administration costs

5  would not exceed (Dkt. No. 292-1 ¶ 6.4).  The additional class notice shall still issue, however.

6  ### C.   CLASS REPRESENTATIVE SERVICE AWARD.

7  Finally, we consider the class representative service award.  In brief, class counsel's

8  requested $15,000 class representative service award is unreasonably high.  Likewise, defense

9  counsel's suggested $2,000 class representative service award is unreasonably high.  This order

10  finds $500 will reasonably compensate Ms. Dekker for her work on the case.

11  To support their request for a $15,000 class representative service award, class counsel

12  emphasize that Ms. Dekker assumed a reputational risk by serving as a named plaintiff, citing

13  *Billinghausen* [*sic*] and *Guippone* (Fees Br. 23).  306 F.R.D. 245; *Guippone v. BH S & B*

14  *Holdings*, *LLC*, No. C. 09-01029 CM, 2011 WL 5148650 (S.D.N.Y. Oct. 28, 2011) (Judge

15  Colleen McMahon).  But those two cases dealt with employment law claims, and it cannot be

16  said that Ms. Dekker, who is by all accounts retired, risks discrimination by future employers

17  because she served as a named plaintiff in a small class action asserting liquidated damages

18  claims against a solar company.  "The trial court is not bound to, and should not, accept

19  conclusory statements about 'potential stigma' and 'potential risk,' in the absence of

20  supporting evidence."  *Wilson v. Tesla, Inc.*, 833 F. App'x 59, 62 (9th Cir. 2020) (quoting

21  *Clark v. Am. Residential Servs. LLC*, 96 Cal. Rptr. 3d 441, 457 (Cal. Ct. App. 2009)).

22  Additionally, Ms. Dekker's lack of involvement in the case and lack of familiarity with

23  the claims asserted made the issue of adequacy at class certification "a closer call than many"

24  (Dkt. No. 230 at 5).  To compensate her in an amount corresponding to $250 per hour under

25  such circumstances would be inappropriate — all the more so in view of the glaring

---

[12] *See also Olson v. Auto. Club of S. Cal.*, 179 P.3d 882, 884–85 (Cal. 2008) (holding that Section 1021.5 of the California Code of Civil Procedure does not separately authorize recovering expert witness fees).

1   inconsistencies between Ms. Dekker's declaration in support of the service award, her sworn

2   testimony, and class counsel's billing records (*see* Fees Opp. 19–20).  By way of example, in

3   her declaration, Ms. Dekker says that she spent five hours meeting with her attorney to prepare

4   for her deposition (Dkt. No. 295-6 ¶ 4).  Yet at her deposition, Ms. Dekker testified that she

5   spent only "[a]n hour, maybe an hour and a half, with the two attorneys" to prepare (Dkt.

6   No. 296-8 at 7).  Class counsel's billing records reflect that two attorneys spent 0.9 hours and

7   1.5 hours preparing her, respectively (Dkt. No. 295-3 at 29).  As such, this order APPROVES a

8   class representative service award of $500.

9                                          **CONCLUSION**

10          For the foregoing reasons, final approval of the class settlement is GRANTED.  To the

11   extent stated herein, the motion for attorney's fees, expenses, and a class representative service

12   award is GRANTED.  Class counsel are presently awarded **$100,000 in ATTORNEY'S FEES** and

13   may seek additional fees in three years pursuant to this order.  Class counsel's costs in the

14   amount of **$25,427.60** to be paid immediately are APPROVED.  A class representative service

15   award in the amount of **$500** to be paid immediately to Ms. Dekker is APPROVED.

16          **IT IS SO ORDERED.**

17

18   Dated:  August 23, 2023.

19                                                    _____

20                                                    WILLIAM ALSUP
                                                      UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

United States District Court
Northern District of California